## ROSE, WARDEN *v.* MITCHELL ET AL.

No. 77–1701.  Argued January 16, 1979—Decided July 2, 1979

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN and MARSHALL, JJ., joined; in Parts I, III, and IV of which BURGER, C. J., and REHNQUIST, J., joined; and in Parts I and II of which WHITE and STEVENS, JJ., joined. REHNQUIST, J., filed a statement concurring in part, *post,* p. 574. STEWART, J., *post,* p. 574, and POWELL, J., *post,* p. 579, filed opinions concurring in the judgment, in which REHNQUIST, J., joined. WHITE, J., filed a dissenting opinion, in which STEVENS, J., joined, *post,* p. 588. STEVENS, J., filed an opinion dissenting in part, *post,* p. 593.

*William M. Leech, Jr.,* Attorney General of Tennessee, argued the cause for petitioner. With him on the brief was *Michael E. Terry,* Assistant Attorney General.

*Walter Kurtz* argued the cause and filed a brief for respondents.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.†

In this federal habeas corpus case, respondents claim they were the victims of racial discrimination, in violation of the Equal Protection Clause of the Fourteenth Amendment, in the selection of the foreman of the Tennessee grand jury that indicted them for murders in the first degree. As the case comes to this Court, no issue of discrimination in the selection of the venire is presented; we are concerned only with the selection of the foreman.

I

In November 1972, respondents James E. Mitchell and James Nichols, Jr., and two other men were jointly indicted by the grand jury of Tipton County, Tenn. The four were charged in two counts of first-degree murder in connection with the shooting deaths of patrons during the robbery of

---

*\*Solicitor General McCree, Assistant Attorney General Days, Walter W. Barnett,* and *Mildred M. Matesich* filed a memorandum for the United States as *amicus curiae* urging affirmance.

†MR. CHIEF JUSTICE BURGER and MR. JUSTICE REHNQUIST join only Parts I, III, and IV of the opinion, and MR. JUSTICE WHITE and MR. JUSTICE STEVENS join only Parts I and II.

a place known as White's Cafe.[1] Prior to trial, respondents filed with the trial court a written *pro se* motion in the nature of a plea in abatement. App. 1. They sought thereby, together with other relief, the dismissal of the indictment on the grounds that the grand jury array, and the foreman, had been selected in a racially discriminatory fashion.[2] Each respondent is a Negro.

---

[1] The Constitution of Tennessee requires that any prosecution for the crimes with which respondents were charged be instituted by presentment or indictment by a grand jury. Tenn. Const., Art. I, § 14.

[2] In Tennessee, the grand jury is composed of 12 grand jurors, Tenn. Code Ann. § 40–1501 (1975), and a foreman or forewoman who "shall be the thirteenth member of each grand jury organized during his term of office, having equal power and authority in all matters coming before the grand jury with the other members thereof." § 40–1506 (Supp. 1978). The foreman or forewoman is appointed for a term of two years by the judge of the court having criminal jurisdiction in the county. *Ibid.* There is no limitation on reappointment. The foreman or forewoman must be at least 25 years of age, "shall be a good and lawful man or woman," and possess all the other qualifications required of Tennessee jurors. § 40–1507 (Supp. 1978). See § 22–101 (Supp. 1978).

The members of the grand jury, other than the foreman or forewoman, are selected through the operation of the "key man" system, whereby three jury commissioners compile a list of qualified potential jurors from which the grand jurors are selected at random. See §§ 22–223 to 22–228 (Supp. 1978); §§ 40–1501 and 40–1502 (1975). Twelve members of the grand jury must concur in order to return an indictment. § 40–1706 (1975). The foreman or forewoman may be 1 of the 12. *Bolen* v. *State*, 554 S. W. 2d 918, 920 (Tenn. Crim. App. 1976). The foreman or forewoman acts as chairman or "presiding officer." *State* v. *Collins*, 65 Tenn. 151, 153 (1873). He or she is charged with the duty of assisting the district attorney in investigating crime, may order the issuance of subpoenas for witnesses before the grand jury, may administer oaths to grand jury witnesses, must endorse every bill returned by the grand jury, and must present any indictment to the court in the presence of the grand jury. Tenn. Code Ann. §§ 40–1510, 40–1622, 40–1706, and 40–1709 (1975 and Supp. 1978). The absence of the foreman's endorsement makes an indictment "fatally defective." *Bird* v. *State*, 103 Tenn. 343, 344, 52 S. W. 1076 (1899).

The court appointed counsel to represent respondents and in due course conducted an evidentiary hearing on the plea in abatement. At that hearing, testimony on behalf of the respondents was taken from the 3 Tipton County jury commissioners; from 2 former Tipton County grand jury foremen; from the foreman of the grand jury serving at the time respondents were indicted; and from 11 of the 12 other members of that grand jury. The court clerk was a witness on behalf of the State. *Id.*, at 3–35.

At the close of this evidence, the court denied the plea in abatement, first orally, and then by written order, without comment. *Id.*, at 35 and 36.

Respondents were then tried jointly to a jury. A verdict of guilty of first-degree murder on each count was returned. Respondents received sentences of 60 years on each count, the sentences to run consecutively with credit allowed for time spent in jail awaiting trial.

On appeal, the Court of Criminal Appeals of Tennessee affirmed the convictions, finding, with respect to an assignment of error relating to the plea in abatement, that the "facts here do not demonstrate a systematic exclusion of Negroes upon racial grounds." *Id.*, at 38–39. The Supreme Court of Tennessee denied certiorari. *Id.*, at 42.

Respondents each then filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the Western District of Tennessee, *id.*, at 43–52, 62–73, renewing, among other things, the allegation of discrimination in the selection of the Tipton County grand jury and its foreman. The District Court referred the petitions to a magistrate who, after reviewing the evidence introduced in the state court at the hearing on the plea in abatement and studying the method of selection, recommended that the court hold an evidentiary hearing on the grand jury and jury foreman selection issues. Specifically, the magistrate concluded that respondents had presented an unrebutted prima facie case

with respect to the selection of the foreman. *Id.*, at 84, 90, 97. The District Court disagreed with the magistrate as to the grand jury, and concluded that the state judge had ruled correctly on that issue. On the foreman question, the District Court went along with the magistrate, and ordered the State to make further response. *Id.*, at 98. The State then submitted affidavits from the acting foreman of the grand jury that indicted respondents and from the state trial judge who appointed the foreman. *Id.*, at 102–106, 108–113. On the basis of these affidavits, the petitions were ordered dismissed. *Id.*, at 121–122.

The District Judge, however, granted the certificate of probable cause required by Fed. Rule App. Proc. 22 (b), App. 126–127, and respondents appealed to the United States Court of Appeals for the Sixth Circuit.

The Court of Appeals reversed. 570 F. 2d 129 (1978). That court deemed it unnecessary to resolve respondents' contentions concerning discrimination in the selection of the grand jury venire, *id.*, at 134, since it found sufficient grounds to reverse with respect to the selection of the foreman. It remanded the case with instructions for the entry of an order that respondents' murder convictions be set aside and that respondents be reindicted within 60 days or be released. *Id.*, at 137.

We granted certiorari to consider the foreman issue. 439 U. S. 816 (1978).

II

We initially address two arguments that, aside from the specific facts of this particular case, go to the question whether a federal court, as a matter of policy, should hear claims of racial discrimination in the selection of a grand jury when reviewing a state conviction. First, we consider whether claims of grand jury discrimination should be considered harmless error when raised, on direct review or in a habeas corpus proceeding, by a defendant who has been found guilty beyond a

reasonable doubt by a properly constituted petit jury at a trial on the merits that was free from other constitutional error. Second, we consider the related question whether such claims should be cognizable any longer on federal habeas corpus in light of the decision in *Stone* v. *Powell,* 428 U. S. 465 (1976).

A

For nearly a century, this Court in an unbroken line of cases has held that "a criminal conviction of a Negro cannot stand under the Equal Protection Clause of the Fourteenth Amendment if it is based on an indictment of a grand jury from which Negroes were excluded by reason of their race." *Alexander* v. *Louisiana,* 405 U. S. 625, 628 (1972); *Bush* v. *Kentucky,* 107 U. S. 110, 119 (1883); *Neal* v. *Delaware,* 103 U. S. 370, 394 (1881). See *Castaneda* v. *Partida,* 430 U. S. 482, 492–495, and n. 12 (1977).[3] A criminal defendant "is entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice." *Alexander* v. *Louisiana,* 405 U. S., at 628–629. Accordingly, where sufficient proof of discrimination in violation of the Fourteenth Amendment has been made out and not rebutted, this Court uniformly has required that the conviction be set aside and the indictment returned by the unconstitutionally constituted grand jury be quashed. *E. g., Hill* v. *Texas,* 316 U. S. 400, 406 (1942).[4]

---

[3] In *Castaneda* v. *Partida,* we noted that among the cases in which the Court had applied this principle in circumstances involving grand jury discrimination were *Bush* v. *Kentucky; Carter* v. *Texas,* 177 U. S. 442 (1900); *Rogers* v. *Alabama,* 192 U. S. 226 (1904); *Pierre* v. *Louisiana,* 306 U. S. 354 (1939); *Smith* v. *Texas,* 311 U. S. 128 (1940); *Hill* v. *Texas,* 316 U. S. 400 (1942); *Cassell* v. *Texas,* 339 U. S. 282 (1950); *Reece* v. *Georgia,* 350 U. S. 85 (1955); *Eubanks* v. *Louisiana,* 356 U. S. 584 (1958); *Arnold* v. *North Carolina,* 376 U. S. 773 (1964); and *Alexander* v. *Louisiana.*

[4] In view of the disposition of this case on the merits, we may assume

Until today, only one Justice among those who have served on this Court in the 100 years since *Strauder* v. *West Virginia*, 100 U. S. 303 (1880), has departed from this line of decisions. In his dissent in *Cassell* v. *Texas,* 339 U. S. 282, 298 (1950), Mr. Justice Jackson voiced this lone objection by arguing that federal courts should not set aside criminal convictions solely on the ground that discrimination occurred in the selection of the grand jury, so long as no constitutional impropriety tainted the selection of the petit jury, and guilt was established beyond a reasonable doubt at a trial free from constitutional error. The *Cassell* dissent noted that discrimination in the selection of the grand jury had nothing to do with the fairness of the trial or the guilt or innocence of the defendant, and that reversal based on such discrimination conflicted "with another principle important to our law, *viz.,* that no conviction should be set aside for errors not affecting substantial rights of the accused." *Id.,* at 299.

Mr. Justice Jackson could discern no reason to permit this conflict. In the first place, he noted, the convicted defendant suffered no possible prejudice. Unlike the petit jury, the grand jury sat only to determine probable cause to hold the defendant for trial. It did not consider the ultimate issue of guilt or innocence. Once a trial court heard all the evidence and determined it was sufficient to submit the case to the trier of fact, and once that trier determined that the defendant was guilty beyond a reasonable doubt, Mr. Justice Jackson believed that it "hardly lies in the mouth of a defendant . . . to say that his indictment is attributable to prejudice." *Id.,* at 302. "Under such circumstances," he concluded, "it is frivolous to contend that any grand jury, however constituted, could have done its duty in any way other than to indict." *Ibid.*

without deciding that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire. See *Carter* v. *Jury Comm'n,* 396 U. S. 320, 338 (1970).

Nor did Mr. Justice Jackson believe the *Strauder* line of cases to be justified by a need to enforce the rights of those discriminated against to sit on grand juries without regard to their race. He pointed out that Congress had made it a crime to discriminate in this manner, 18 U. S. C. § 243,[5] and that civil remedies at law and equity were available to members of the class discriminated against. Accordingly, Mr. Justice Jackson would have held that "discrimination in selection of the grand jury . . . , however great the wrong toward qualified Negroes of the community, was harmless to this defendant," 339 U. S., at 304, and would have left enforcement of Fourteenth Amendment interests to criminal prosecutions under § 243 and civil actions instituted by such "qualified Negroes."

This position for the first time has attracted the support of additional Members of the Court, as expressed in the separate opinion of MR. JUSTICE STEWART in this case. Echoing the *Cassell* dissent, this separate opinion asserts that "the time has come to acknowledge that Mr. Justice Jackson's [position] is unanswerable, and to hold that a defendant may not rely on a claim of grand jury discrimination to overturn an otherwise valid conviction." *Post,* at 575. It argues that the conviction of the defendant should be a break in the chain of events that preceded it, and notes that where Fourth or Fifth Amendment rights are violated, the evidence illegally obtained is suppressed, but "the prosecution is not barred altogether." *Post,* at 576–577, n. 4. The separate opinion be-

---

[5] Title 18 U. S. C. § 243 provides:

"No citizen possessing all other qualifications which are or may be prescribed by law shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude; and whoever, being an officer or other person charged with any duty in the selection or summoning of jurors, excludes or fails to summon any citizen for such cause, shall be fined not more than $5,000."

lieves that any other interests that are harmed by grand jury discrimination may be protected adequately by prosecutions, civil actions, or pretrial remedies available to defendants. In such circumstances, it finds the heavy social cost entailed in a reversal unjustified, especially in light of the fact the defendant himself has suffered no prejudice. Accordingly, the separate opinion would not recognize, either on direct review or on an application for a writ of habeas corpus, a claim of grand jury discrimination as a valid ground for setting aside a criminal conviction.[6]

This Court, of course, consistently has rejected this argument. It has done so implicitly in those cases in which it has reaffirmed the *Strauder* principle in the context of grand jury discrimination. *E. g., Reece* v. *Georgia,* 350 U. S. 85, 87 (1955); *Alexander* v. *Louisiana,* 405 U. S., at 628. And it has done so expressly, where the argument was pressed in the guise of the claim that the constitutional rights of the defendant are not violated by grand jury discrimination since an indictment only brings that defendant before the petit jury for trial. *Pierre* v. *Louisiana,* 306 U. S. 354, 356–358 (1939). See *Cassell* v. *Texas,* 339 U. S., at 290 (Frankfurter, J., concurring); *id.,* at 296 (Clark, J., concurring). We decline now to depart from this longstanding consistent practice, and we adhere to the Court's previous decisions.

Discrimination on account of race was the primary evil at which the Amendments adopted after the War Between the States, including the Fourteenth Amendment, were aimed. The Equal Protection Clause was central to the Fourteenth Amendment's prohibition of discriminatory action by the

---

[6] The State makes a variation of this argument by contending that any constitutional error that occurred in the selection of the foreman of the grand jury is "now moot procedural error which had no effect on the integrity of the trial," Brief for Petitioner 29, and so was harmless beyond a reasonable doubt in light of the subsequent conviction by a properly constituted petit jury.

State: it banned most types of purposeful discrimination by the State on the basis of race in an attempt to lift the burdens placed on Negroes by our society. It is clear from the earliest cases applying the Equal Protection Clause in the context of racial discrimination in the selection of a grand jury, that the Court from the first was concerned with the broad aspects of racial discrimination that the Equal Protection Clause was designed to eradicate, and with the fundamental social values the Fourteenth Amendment was adopted to protect, even though it addressed the issue in the context of reviewing an individual criminal conviction. Thus, in the first case establishing the principles that have guided the Court's decisions these 100 years, the Court framed the issue in terms of the larger concerns with racial discrimination in general that it understood as being at the core of the Fourteenth Amendment:

"The very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others. . . . [T]he apprehension that through prejudice [such persons] might be denied that equal protection, that is, that there might be discrimination against them, was the inducement to bestow upon the national government the power to enforce the provision that no State shall deny to them the equal protection of the laws." *Strauder* v. *West Virginia*, 100 U. S., at 308, 309.

Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice. Selection of members of a grand jury because they are of one race and not another destroys the appearance of justice and

thereby casts doubt on the integrity of the judicial process. The exclusion from grand jury service of Negroes, or any group otherwise qualified to serve, impairs the confidence of the public in the administration of justice. As this Court repeatedly has emphasized, such discrimination "not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Smith* v. *Texas*, 311 U. S. 128, 130 (1940) (footnote omitted). The harm is not only to the accused, indicted as he is by a jury from which a segment of the community has been excluded. It is to society as a whole. "The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." *Ballard* v. *United States*, 329 U. S. 187, 195 (1946).

Because discrimination on the basis of race in the selection of members of a grand jury thus strikes at the fundamental values of our judicial system and our society as a whole, the Court has recognized that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded. *E. g., Neal* v. *Delaware*, 103 U. S., at 394; *Reece* v. *Georgia*, 350 U. S., at 87. For this same reason, the Court also has reversed the conviction and ordered the indictment quashed in such cases without inquiry into whether the defendant was prejudiced in fact by the discrimination at the grand jury stage. Since the beginning, the Court has held that where discrimination in violation of the Fourteenth Amendment is proved, " '[t]he court will correct the wrong, will quash the indictment[,] or the panel[;] or, if not, the error will be corrected in a superior court,' and ultimately in this court upon review," and all without regard to prejudice. *Neal* v. *Delaware*, 103 U. S., at 394, quoting *Virginia* v. *Rives*, 100 U. S. 313, 322 (1880). See *Bush* v. *Ken-*

*tucky,* 107 U. S., at 119. The Court in *Hill* v. *Texas,* 316 U. S., at 406, stated:

> "[N]o State is at liberty to impose upon one charged with crime a discrimination in its trial procedure which the Constitution, and an Act of Congress passed pursuant to the Constitution, alike forbid. Nor is this Court at liberty to grant or withhold the benefits of equal protection, which the Constitution commands for all, merely as we may deem the defendant innocent or guilty. *Tumey* v. *Ohio,* 273 U. S. 510, 535. It is the State's function, not ours, to assess the evidence against a defendant. But it is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees. Where, as in this case, timely objection has laid bare a discrimination in the selection of grand jurors, the conviction cannot stand, because the Constitution prohibits the procedure by which it was obtained. Equal protection of the laws is something more than an abstract right. It is a command which the State must respect, the benefits of which every person may demand. Not the least merit of our constitutional system is that its safeguards extend to all—the least deserving as well as the most virtuous." [7]

We do not deny that there are costs associated with this approach. But the remedy here is in many ways less drastic than in situations where other constitutional rights have been violated. In the case of a Fourth or Fifth Amendment violation, the violation often results in the suppression of evidence that is highly probative on the issue of guilt. Here,

---

[7] The fact that there is no constitutional requirement that States institute prosecutions by means of an indictment returned by a grand jury, see *Hurtado* v. *California,* 110 U. S. 516 (1884), does not relieve those States that do employ grand juries from complying with the commands of the Fourteenth Amendment in the operation of those juries.

558

however, reversal does not render a defendant "immune from prosecution," nor is a subsequent reindictment and reprosecution "barred altogether," as Mr. Justice Stewart's opinion suggests. *Post,* at 576–577, n. 4. "A prisoner whose conviction is reversed by this Court need not go free if he is in fact guilty, for [the State] may indict and try him again by the procedure which conforms to constitutional requirements." *Hill* v. *Texas,* 316 U. S., at 406. And in that subsequent prosecution, the State remains free to use all the proof it introduced to obtain the conviction in the first trial.

In any event, we believe such costs as do exist are outweighed by the strong policy the Court consistently has recognized of combating racial discrimination in the administration of justice. And regardless of the fact that alternative remedies remain to vindicate the rights of those members of the class denied the chance to serve on grand juries, the fact is that permitting challenges to unconstitutional state action by defendants has been, and is, the main avenue by which Fourteenth Amendment rights are vindicated in this context. Prosecutions under 18 U. S. C. § 243 have been rare, and they are not under the control of the class members and the courts. Civil actions, expensive to maintain and lengthy, have not often been used. And even assuming that some type of pretrial procedure would be open to a defendant, *e. g.,* petitioning for a writ of habeas corpus in federal court, under such a procedure the vindication of federal constitutional rights would turn on a race to obtain a writ before the State could commence the trial.

We think the better view is to leave open the route that over time has been the main one by which Fourteenth Amendment rights in the context of grand jury discrimination have been vindicated. For we also cannot deny that, 114 years after the close of the War Between the States and nearly 100 years after *Strauder,* racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our

society as a whole. Perhaps today that discrimination takes a form more subtle than before. But it is not less real or pernicious. We therefore decline "to reverse a course of decisions of long standing directed against racial discrimination in the administration of justice," *Cassell* v. *Texas,* 339 U. S., at 290 (Frankfurter, J., concurring), and we adhere to our position that discrimination in the selection of the grand jury remains a valid ground for setting aside a criminal conviction.[8]

## B

The State makes the additional argument that the decision in *Stone* v. *Powell,* 428 U. S. 465 (1976), should be extended so as to foreclose a grant of federal habeas corpus relief to a state prisoner on the ground of discrimination in the selection of the grand jury. MR. JUSTICE POWELL, dissenting in *Castaneda* v. *Partida,* 430 U. S., at 508 n. 1, joined by THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST, and at least inferentially by MR. JUSTICE STEWART, *id.,* at 507, specifically observed that a "strong case may be made that claims of grand jury discrimination are not cognizable on federal habeas corpus after *Stone* v. *Powell.*" In this connection, MR. JUSTICE POWELL noted that a claim by a convicted prisoner of grand jury discrimination goes only to the "moot determination by the grand jury that there was sufficient cause to proceed to trial [and not to any] flaw in the trial itself." *Id.,* at 508 n. 1. He concluded that, as in *Stone,* "the incremental benefit of extending habeas corpus as a means of correcting unconstitutional grand jury selection procedures might be viewed as 'outweighed by the acknowledged costs to other values vital to a rational system of criminal justice.'" 430 U. S., at 508 n. 1, quoting *Stone,* 428 U. S., at 494.

---

[8] There is no contention in this case that respondents sought to press their challenge to the grand jury without complying with state procedural rules as to when such claims may be raised. See *Francis* v. *Henderson,* 425 U. S. 536 (1976). Nor do they seek to press this challenge after pleading guilty. See *Tollett* v. *Henderson,* 411 U. S. 258 (1973).

The State echoes these arguments. It contends that habeas corpus relief should be granted only where the error alleged in support of that relief affected the determination of guilt. In this case, as in *Stone* v. *Powell,* it argues, no error affected the trial on the merits. Moreover, only a relatively minor error, involving the nonvoting foreman of the grand jury and not the entire venire, is at issue. Accordingly, following its interpretation of *Stone,* the State contends that the benefits derived from extending habeas relief in this case are outweighed by the costs associated with reversing a state conviction entered upon a finding of guilt beyond a reasonable doubt at a trial free from constitutional error.[9]

In *Stone* v. *Powell,* however, the Court carefully limited the reach of its opinion. It stressed that its decision to limit review was *"not* concerned with the scope of the habeas corpus statute as authority for litigating constitutional claims generally." 428 U. S., at 495 n. 37 (emphasis in original). Rather, the Court made it clear that it was confining its ruling to cases involving the judicially created exclusionary rule, which had minimal utility when applied in a habeas corpus proceeding. "In sum," the Court concluded, it was holding "only that a federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review." *Ibid.*

Mindful of this limited reach of *Stone,* we conclude that a claim of discrimination in the selection of the grand jury differs so fundamentally from application on habeas of the

[9] The *Stone* v. *Powell* issue was raised by petition for rehearing in the Court of Appeals. App. 142. In denying that petition, the court stated "that the issues raised therein were fully considered upon the original submission and decision of this case." *Id.,* at 151. In its opinion denying respondents' motion for amendment of judgment, the District Court found that its original ruling denying the writ was bolstered by the decision in *Stone.* App. 125.

Fourth Amendment exclusionary rule that the reasoning of *Stone* v. *Powell* should not be extended to foreclose habeas review of such claims in federal court.

In the first place, claims such as those pressed by respondents in this case concern allegations that the trial court itself violated the Fourteenth Amendment in the operation of the grand jury system. In most such cases, as in this one, this same trial court will be the court that initially must decide the merits of such a claim, finding facts and applying the law to those facts. This leads us to doubt that claims that the operation of the grand jury system violates the Fourteenth Amendment in general will receive the type of full and fair hearing deemed essential to the holding of *Stone*. See, *e. g.*, 428 U. S., at 494, 495 n. 37. In Fourth Amendment cases, courts are called upon to evaluate the actions of the police in seizing evidence, and this Court believed that state courts were as capable of performing this task as federal habeas courts. *Id.*, at 493–494, n. 35. But claims that the state judiciary itself has purposely violated the Equal Protection Clause are different. There is a need in such cases to ensure that an independent means of obtaining review by a federal court is available on a broader basis than review only by this Court will permit. A federal forum must be available if a full and fair hearing of such claims is to be had.

Beyond this, there are fundamental differences between the claim here at issue and the claim at issue in *Stone* v. *Powell*. Allegations of grand jury discrimination involve charges that state officials are violating the direct command of the Fourteenth Amendment, and federal statutes passed under that Amendment, that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Since the first days after adoption of the Amendment, the Court has recognized that by its direct operation the Equal Protection Clause forbids the States to discriminate in the selection of members of a grand jury. This contrasts with

the situation in *Stone,* where the Court considered application of "a judicially created remedy rather than a personal constitutional right." 428 U. S., at 495 n. 37. Indeed, whereas the Fourteenth Amendment by its terms always has been directly applicable to the States, the Fourth Amendment and its attendant exclusionary rule only recently have been applied fully to the States.

In this context, the federalism concerns that motivated the Court to adopt the rule of *Stone* v. *Powell* are not present. Federal courts have granted relief to state prisoners upon proof of the proscribed discrimination for nearly a century. See, *e. g., Virginia* v. *Rives,* 100 U. S., at 322. The confirmation that habeas corpus remains an appropriate vehicle by which federal courts are to exercise their Fourteenth Amendment responsibilities is not likely further to increase "'friction between our federal and state systems of justice, [or impair] the maintenance of the constitutional balance upon which the doctrine of federalism is founded.'" *Stone* v. *Powell,* 428 U. S., at 491 n. 31, quoting *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 259 (1973) (POWELL, J., concurring).

Further, *Stone* rested to a large extent on the Court's perception that the exclusionary rule is of minimal value when applied in a federal habeas proceeding. The Court there found that the deterrent value of the exclusionary rule was not enhanced by the possibility that a "conviction obtained in state court and affirmed on direct review might be overturned in collateral proceedings often occurring years after the incarceration of the defendant." 428 U. S., at 493. Nor did the Court believe that the "overall educative effect of the exclusionary rule would be appreciably diminished if search-and-seizure claims could not be raised in federal habeas corpus review of state convictions." *Ibid.* And it could not find any basis to say that federal review would reveal flaws in the search or seizure that had gone undetected at trial or on appeal. *Ibid.* In these circumstances, the Court concluded

that the benefits of applying the Fourth Amendment exclusionary rule on federal habeas did not outweigh the costs associated with it.

None of this reasoning has force here. Federal habeas review is necessary to ensure that constitutional defects in the state judiciary's grand jury selection procedure are not overlooked by the very state judges who operate that system. There is strong reason to believe that federal review would indeed reveal flaws not appreciated by state judges perhaps too close to the day-to-day operation of their system to be able properly to evaluate claims that the system is defective. The educative and deterrent effect of federal review is likely to be great, since the state officials who operate the system, judges or employees of the judiciary, may be expected to take note of a federal court's determination that their procedures are unconstitutional and must be changed.

We note also that *Stone* rested to an extent on the Court's feeling that state courts were as capable of adjudicating Fourth Amendment claims as were federal courts. But where the allegation is that the state judiciary itself engages in discrimination in violation of the Fourteenth Amendment, there is a need to preserve independent federal habeas review of the allegation that federal rights have been transgressed. As noted above, in this case, the very judge whose conduct respondents challenged decided the validity of that challenge.

It is also true that the concern with judicial integrity, deprecated by the Court in *Stone* in the context of habeas review of exclusionary rule issues, is of much greater concern in grand jury discrimination cases. The claim that the court has discriminated on the basis of race in a given case brings the integrity of the judicial system into direct question. The force of this justification for extending federal habeas review cannot be said to be minimal where allegations of improper judicial conduct are made.

As pointed out in our discussion of the *Cassell* dissent, it

is tempting to exaggerate the costs associated with quashing an indictment returned by an improperly constituted grand jury. In fact, the costs associated with quashing an indictment are significantly less than those associated with suppressing evidence. Evidence suppressed under the Fourth Amendment may not be used by the State in any new trial, though it be highly probative on the issue of guilt. In contrast, after a federal court quashes an indictment, the State remains free to use at a second trial any and all evidence it employed at the first proceeding. A prisoner who is guilty in fact is less likely to go free, therefore, than in cases involving the exclusionary rule. *Hill* v. *Texas,* 316 U. S., at 406. Providing federal habeas corpus relief is, as a consequence, less of an intrusion on the State's system of criminal justice than was the case in *Stone.*

Finally, we note that the constitutional interests that a federal court adjudicating a claim on habeas of grand jury discrimination seeks to vindicate are substantially more compelling than those at issue in *Stone.* As noted above, discrimination on account of race in the administration of justice strikes at the core concerns of the Fourteenth Amendment and at fundamental values of our society and our legal system. Where discrimination that is "at war with our basic concepts of a democratic society and a representative government," *Smith* v. *Texas,* 311 U. S., at 130, infects the legal system, the strong interest in making available federal habeas corpus relief outweighs the costs associated with such relief.

We therefore decline to extend the rationale of *Stone* v. *Powell* to a claim of discrimination in the selection of the grand jury that indicts the habeas petitioner. And we hold that federal habeas corpus relief remains available to provide a federal forum for such claims.

### III

Notwithstanding these holdings that claims of discrimination in the selection of members of the grand jury are cogniza-

ble on federal habeas corpus, and will support issuance of a writ setting aside a state conviction and ordering the indictment quashed, it remains true that to be entitled to habeas relief the present respondents were required to prove discrimination under the standards set out in this Court's cases. That is, "in order to show that an equal protection violation has occurred in the context of grand jury [foreman] selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda* v. *Partida,* 430 U. S., at 494. Specifically, respondents were required to prove their prima facie case with regard to the foreman as follows:

> "The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. . . . Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time. . . . This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." *Ibid.*

Only if respondents established a prima facie case of discrimination in the selection of the foreman in accord with this approach, did the burden shift to the State to rebut that prima facie case. *Id.,* at 495.

There is no question, of course, that respondents, as Negroes, are members of a group recognizable as a distinct class capable of being singled out for different treatment under the laws. *Id.,* at 494; *Hernandez* v. *Texas,* 347 U. S. 475,

566

478–479 (1954). And one may assume for purposes of this case that the Tennessee method of selecting a grand jury foreman is susceptible of abuse. Accordingly, we turn to a consideration of the evidence offered by respondents in their attempt to prove sufficient underrepresentation to make out a prima facie case.

Respondents' case at the hearing on the plea in abatement consisted in its entirety of the following:

Respondents first called as witnesses the three Tipton County jury commissioners. These commissioners, all white, testified only as to the selection of the grand jury venire. In view of the Tennessee method of foreman selection, n. 2, *supra,* they did not testify, and could hardly be expected to have testified, as to the method of selection of foremen; neither did any of them refer to the race of any past foremen.

Respondents next called two former foremen and the current foreman of the Tipton County grand jury. The first, Frank McBride, testified that he was a lifelong resident of the county, but there was no evidence as to his age and thus as to the years he lived in the county. McBride stated that he had served as foreman, "ten or twelve years ago . . . for five or six years . . . and then about two or three times since then, just for one session of Court." App. 17. In answer to respondents' inquiry whether he had "ever known of any foreman that was a black man," McBride said "No, sir." *Id.,* at 18. The second past foreman, Peyton J. Smith, stated that he had resided in Tipton County all his life but, again, no inquiry was made to as to how long that had been. Smith testified that he had served as foreman "for several years back in the early '50's, and . . . several times since then on occasion of the illness of the foreman at that time." *Id.,* at 20. Like McBride, Smith answered "No" when asked whether he had ever known of a Negro foreman. *Ibid.* Jimmy Naifeh, the current foreman, testified that he had served for approximately two years and that he did not know "if there was or if there wasn't" ever a Negro foreman of the county

grand jury. *Id.,* at 25. No inquiry was made of Naifeh as to the length of time he had lived in the county.

Respondents then called 11 of the 12 grand jurors[10] (other than the foreman) who were serving when respondents were indicted. Not one testified relative to the selection of the foreman or the race of past foremen. Their testimony, individually and collectively, was to the effect that one among their number was a Negro; that they had heard only one witness, a deputy sheriff, on respondents' case; that no one voiced any prejudice or hostility toward respondents because of their race; and that there was no consideration of the fact that respondents were Negroes. Indeed, when some were asked whether they knew whether respondents were Negroes, they answered in the negative. *Id.,* at 26–32.

This was *all* the evidence respondents presented in support of their case. In rebuttal, the State called only the clerk of the trial court. He was asked no question relating to grand jury foremen, and respondents made no inquiry of him on cross-examination on that or on any other topic. *Id.,* at 34–35.

Two additional facts were stressed by the State at the later federal habeas proceeding. The first was the recruitment, at the 1972 term, of temporary (and former) foreman Smith in place of regular foreman Naifeh. Smith had testified at the hearing on the plea in abatement that Naifeh "could not be here and I was asked to come and appear before this Court and the judge asked me to serve." *Id.,* at 21. The State argued that Smith had been selected only because the judge believed Smith, in view of his experience, would be a capable temporary replacement for the regular foreman. This proper motive, the State said, negated any claim that racial discrimination played a role in the selection of Smith to be

---

[10] The record indicates that one grand juror was in Florida at the time of the hearing. App. 27.

temporary foreman. The second fact was that the temporary foreman did not vote on the indictment returned against respondents, see *id.*, at 105; this was because the other 12 had all voted to indict and the temporary foreman's vote therefore was unnecessary. Thus, the State argued, any possible error in the selection of the foreman was harmless and of no consequence to respondents.

In support of its argument to the federal habeas court, the State submitted the affidavit of the judge who had selected the temporary foreman and the permanent foreman, and who had presided at the hearing on the plea in abatement as well as at respondents' trial. The judge, who had served since 1966, *id.*, at 5, a period of seven years, stated that Naifeh "was unable to serve because he was going to be out of the County at the November 1972 term." *Id.*, at 112. The judge went on to say that he had appointed Smith temporary foreman because Smith had had experience "and does a good job as such foreman." The affidavit concluded:

"In my five counties, I do not have a black grand jury foreman, although I have a black member of my Jury Commission in one county. Most all of my Grand Juries and Petit Juries have sizeable numbers of blacks on them, both men and women. I don't appoint Grand Jury Foreman very often because when their two year term expires, I usually reappoint them, thus they serve a long time and the problem doesn't come up very often. I don't think that I have really given any thought to appointing a black foreman but I have no feeling against doing so." *Id.*, at 113.

It was on the basis of this material in rebuttal that the District Court declined to issue the writs of habeas corpus. It found that no racial discrimination had been proved, since the foreman had been "selected for other than racial reasons, and . . . did not vote at the time the indictment was rendered." *Id.*, at 122.

The Court of Appeals, in reversing, conceded: "The facts elicited at the pretrial hearing were meager." 570 F. 2d, at 132. It went on, however, to note: "There has never been a black foreman or forewoman of a grand jury in Tipton County according to the recollections of the trial judge, three jury commissioners, and three former foremen." *Id.,* at 134–135. This fact, the court concluded, coupled with the opportunity for discrimination found to be inherent· in the selection system, was sufficient to make out a prima facie case of discrimination in the selection of the foreman. And the Court of Appeals held that the State had failed to rebut that case. The exculpatory affidavit of the judge asserting a benign reason for the selection of the foreman, in the court's view, could not serve to rebut respondents' case in the absence of proof that there were no qualified Negroes to serve as foreman. The fact the foreman did not vote, the court held, similarly did not support the District Court's judgment, since the broad powers exercised by the foreman in conducting the grand jury's proceedings meant that respondents could have been prejudiced even though the foreman had not cast a vote against them.

## IV

In reaching our conclusion in disagreement with the Court of Appeals, we note first that that court seems to have over-emphasized and exaggerated the evidence in support of its conclusion that there had "never been a black foreman or forewoman of a grand jury in Tipton County." The Court of Appeals believed this conclusion had been proved by the recollections of the trial judge, the testimony of three jury commissioners, and the testimony of three former foremen. *Ibid.* But recollections of the trial judge—by which the Court of Appeals presumably meant the affidavit filed in Federal District Court by the trial judge—formed no part of the case put on by respondents. (Indeed, the Court of

Appeals seems to have recognized this in another portion of its opinion, where it considered the state trial judge's affidavit to have been offered in rebuttal of the respondents' asserted prima facie case.) And the jury commissioners gave no testimony whatsoever relating to foremen of the grand jury, to the method of selecting foremen, or to the race of past foremen. Thus, respondents' prima facie case as to discrimination in the selection of grand jury foremen rested entirely and only on the testimony of the three foremen. On the record of this case, it is that testimony alone upon which respondents' allegations of discrimination must stand or fall.

The testimony of the three foremen, however, did not establish respondents' case. First, it cannot be said that the testimony covered any significant period of time. Smith testified that he served in the early 1950's and occasionally thereafter, but except for the fact that Smith was resident in the county, and for his negative answer to the question whether he had "known of any foreman that has been black," there is nothing in the record to show that Smith knew who had served as foremen in the interim years when he was not serving. Similarly, McBride testified that he had served for 5 or 6 years some 10 or 12 years prior to the 1973 hearing, and on two or three occasions since then, and had not known of any Negro's having acted as foreman of the grand jury, but he gave no indication that he was knowledgeable as to the years not covered by this service. Naifeh's testimony was the weakest from respondents' point of view. He had served as foreman for only two years prior to the hearing, and he did not know one way or the other whether a Negro had served as foreman of the county grand jury. Thus, even assuming that the period 1951–1973 is the significant one for purposes of this case, respondents' evidence covered only portions of that time and left a number of years during that period about which no evidence whatsoever was offered.

Moreover, such evidence as was provided by the testifying

foremen was of little force. McBride and Smith simply said "No" in response to the question whether either had ever known of any Negro foreman. Naifeh could give no information on the point. There thus was no positive testimony that no Negro had ever served during the critical period of time; the only testimony was that three foremen who served for parts of that period had no knowledge of any. And there is no indication in the record that Smith, McBride, and Naifeh necessarily would have been aware had a Negro ever served as foreman.

Most important, there was no evidence as to the total number of foremen appointed by the judges in Tipton County during the critical period of time. Absent such evidence, it is difficult to say that the number of Negroes appointed foreman, even if zero, is statistically so significant as to make out a case of discrimination under the "rule of exclusion." The only testimony in the record concerning Negro population of the county was to the effect that it was approximately 30%.[11] App. 11. Given the fact that any foreman was not limited in the number of 2-year terms he could serve, and given the inclination on the part of the judge to reappoint, it is likely that during the period in question only a few persons in actual number served as foremen of the grand jury. If the number was small enough, the disparity between the ratio of Negroes chosen to be foreman to the total number of foremen, and the ratio of Negroes to the total population of the county, might not be "sufficiently large [that] it is unlikely that [this disparity] is due solely to chance or accident." *Castaneda v. Partida*, 430 U. S., at 494 n. 13. Inasmuch as there is no evidence in the record of the number of foremen appointed, it is not possible to perform the calculations and comparisons needed to permit a court to conclude that a statistical case of

---

[11] The 1970 census figure was 32.44%. Bureau of the Census, 1970 Census of Population, Characteristics of the Population, Part 44 Tennessee, Table 35, p. 124.

discrimination had been made out, *id.*, at 496–497, n. 17, and proof under the "rule of exclusion" fails. *Id.*, at 494 n. 13; see *Hernandez* v. *Texas,* 347 U. S., at 480.[12]

Comparison of the proof introduced by respondents in this case with the proof offered by defendants in cases where this Court has found that a prima facie case was made out is most instructive. In *Norris* v. *Alabama,* 294 U. S. 587 (1935), for example, the defendant proved his case by witnesses who testified as to the number of Negroes called for jury duty. The evidence in support of the prima facie case was summarized by the Court:

> "It appeared that no negro had served on any grand or petit jury in that county within the memory of witnesses who had lived there all their lives. Testimony to that effect was given by men whose ages ran from fifty to seventy-six years. Their testimony was uncontradicted. It was supported by the testimony of officials. The clerk of the jury commission and the clerk of the circuit court had never known of a negro serving on a grand jury in Jackson County. The court reporter, who had not missed a session in that county in twenty-four years, and two jury commissioners testified to the same effect. One of the latter, who was a member of the commission which made up the jury roll for the grand jury which found the indictment, testified that he had 'never known of a single instance where any negro sat on any grand or

---

[12] Respondents urge us to fill the gap in their proof by reference to the history of race relations in Tennessee and the fact that the State in past years practiced *de jure* discrimination against Negroes in many ways. We decline to do this. Reference to history texts in a case of this kind does not supply what respondents failed to prove. If it were otherwise, one alleging discrimination always would be able to prove his case simply by referring to the history of discrimination within the State. The Court's cases, however, make it clear that more is required to establish a violation of the Equal Protection Clause of the Fourteenth Amendment.

petit jury in the entire history of that county.'" *Id.,* at 591.

See *Castaneda* v. *Partida,* 430 U. S., at 495–496; *Eubanks* v. *Louisiana,* 356 U. S. 584, 586–587 (1958); *Reece* v. *Georgia,* 350 U. S., at 87–88; *Hill* v. *Texas,* 316 U. S., at 402–404.

The comparison of the evidence in *Norris* and in the other cited cases stands in stark contrast with the evidence in the present case. All that we have here to establish the prima facie case is testimony from two former foremen and from a briefly serving present foreman that they had no knowledge of a Negro's having served. There is no evidence that these foremen were knowledgeable about years other than the ones in which they themselves served. And there is no evidence to fill in the gaps for the years they did not serve. In contrast to *Norris,* there is no direct assertion that for long periods of time no Negro had ever served, or that officials with access to county records could state that none had ever served. And there is no basis in the record upon which to determine that, even assuming no Negro had ever served as foreman, that fact statistically was so significant as to support an inference that the disparity between the Negroes serving and the Negro population in the county was the result of discrimination in violation of the Fourteenth Amendment.

It thus was error for the District Court to have concluded initially that respondents made out a prima facie case. And it was error, as well, for the Court of Appeals to have reached the same final conclusion. The State, however, under questioning at oral argument, tended to concede that the finding that a prima facie case had been established was correct ("we did not contest that"), Tr. of Oral Arg. 6–7, and did the same in its brief, although there it described the proof as "very questionable." Brief for Petitioner 26.

Normally, a flat concession by the State might be given effect. But the inadequacy of respondents' proof is plain. And the error of the Court of Appeals in exaggerating the

extent of that proof is equally plain.   We decline to overlook so fundamental a defect in respondents' case.[13]

Accordingly, we hold that, as a matter of law, respondents failed to make out a prima facie case of discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment with regard to the selection of the grand jury foreman.   The judgment of the Court of Appeals is therefore reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE REHNQUIST, concurring in part.

I fully agree with, and have joined, the separate opinions of my Brothers STEWART and POWELL concurring in the judgment in this case.   For the separate reasons they state, neither of them would reach the merits of the claim of grand jury discrimination which the Court decides.   Since, however, a majority of the Court rejects these views, I join Parts I, III, and IV of the Court's opinion.

MR. JUSTICE STEWART, with whom MR. JUSTICE REHNQUIST joins, concurring in the judgment.

The respondents were found guilty beyond a reasonable doubt after a fair and wholly constitutional jury trial.   Why should such persons be entitled to have their convictions set aside on the ground that the grand jury that indicted them was

---

[13] The State in this case apparently places no reliance on 28 U. S. C. § 2254 (d), which provides in relevant part:

"[A] determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction . . . evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear . . .—

"(1) that the merits of the factual dispute were not resolved in the State court hearing . . . ."

See *LaVallee* v. *Delle Rose,* 410 U. S. 690 (1973).

improperly constituted? That question was asked more than 25 years ago by Mr. Justice Jackson in *Cassell* v. *Texas*, 339 U. S. 282, 298 (dissenting opinion). It has never been answered.[1] I think the time has come to acknowledge that Mr. Justice Jackson's question is unanswerable, and to hold that a defendant may not rely on a claim of grand jury discrimination to overturn an otherwise valid conviction.

## I

A grand jury proceeding "is an *ex parte* investigation to determine whether a crime has been committed and whether criminal proceedings should be instituted against any person." *United States* v. *Calandra*, 414 U. S. 338, 343–344. It is not a proceeding in which the guilt or innocence of a defendant is determined, but merely one to decide whether there is a prima facie case against him. Any possible prejudice to the defendant resulting from an indictment returned by an invalid grand jury thus disappears when a constitutionally valid trial jury later finds him guilty beyond a reasonable doubt.[2] In short, a convicted defendant who alleges that he was indicted by a discriminatorily selected grand jury is complaining of an

---

[1] In proffering an answer today, the Court relies on (1) historical precedents and (2) the duty of the courts to apply the Equal Protection Clause with special vigor in the area of racial discrimination.

As to the first ground, I can only recall what Mr. Justice Frankfurter once said: "Wisdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee* v. *Union Planters Bank*, 335 U. S. 595, 600 (dissenting opinion). As to the second ground, I agree wholeheartedly with the Court's general view of the Equal Protection Clause, but believe, as explained in this opinion, that that constitutional guarantee protects the victims of discrimination rather than defendants who have been convicted after fair trials by lawfully constituted juries.

[2] There is no constitutional requirement that a state criminal prosecution even be initiated by a grand jury. A State is free to bring a criminal charge through information filed by a prosecutor. *Hurtado* v. *California*, 110 U. S. 516. And the Court has held that a defendant is not entitled "to judicial oversight or review of the decision to prosecute." *Gerstein* v. *Pugh*, 420 U. S. 103, 119.

antecedent constitutional violation that could have had no conceivable impact on the fairness of the trial that resulted in his conviction.

It is well settled that deprivations of constitutional rights that occur before trial are no bar to conviction unless there has been an impact upon the trial itself.[3]   A conviction after trial, like a guilty plea, "represents a break in the chain of events which has preceded it in the criminal process."   *Tollett* v. *Henderson,* 411 U. S. 258, 267.   See *United States* v. *Blue,* 384 U. S. 251, 255; cf. *Stroble* v. *California,* 343 U. S. 181, 197 ("illegal acts of state officials prior to trial are relevant only as they bear on petitioner's contention that he has been deprived of a fair trial").

The cases in this Court dealing with unlawful arrest are particularly instructive.   Unconstitutional arrests are unreasonable seizures of the person that violate the Fourth and Fourteenth Amendments.   *E. g., Terry* v. *Ohio,* 392 U. S. 1. Yet, an "illegal arrest or detention does not void a subsequent conviction." *Gerstein* v. *Pugh,* 420 U. S. 103, 119.   In *Frisbie* v. *Collins,* 342 U. S. 519, for example, a defendant had been forcibly abducted from one State and brought to another to stand trial, but the trial itself was fair, and the Court upheld his conviction.   See also *Mahon* v. *Justice,* 127 U. S. 700; *Ker* v. *Illinois,* 119 U. S. 436.[4]

---

[3] In *Coleman* v. *Alabama,* 399 U. S. 1, the Court vacated a conviction in a situation where a State had failed to provide a defendant with appointed counsel at the preliminary hearing.   The Court's holding was premised on the opportunity of defense counsel at a preliminary hearing to develop a record that could be useful for impeachment purposes at the trial.   Favorable testimony of a witness who did not appear at trial could also be preserved.   In addition, the Court emphasized the ability of counsel at a preliminary hearing to discover the substance of the prosecution's case and thus to prepare an effective trial defense.   *Id.,* at 9.

[4] Similarly, a defendant is not immune from prosecution under an outstanding indictment if he is searched in violation of his Fourth Amendment rights or interrogated in violation of his *"Miranda"* rights.   Illegally

The cases in this Court specifically dealing with grand jury proceedings are equally instructive. In *Costello* v. *United States,* 350 U. S. 359, the Court sustained the conviction of a defendant who had sought to dismiss the charges against him on the ground that the indictment had been based exclusively upon inadmissible hearsay evidence. See also *Holt* v. *United States,* 218 U. S. 245. In *Lawn* v. *United States,* 355 U. S. 339, the Court held that a defendant could not avoid trial and conviction on the ground that the indictment had been procured by evidence obtained in violation of the Fifth Amendment. "[A]n indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence, . . . or even on the basis of information obtained in violation of a defendant's Fifth Amendment privilege against self-incrimination." *United States* v. *Calandra, supra,* at 345. Cf. *Gelbard* v. *United States,* 408 U. S. 41, 60 ("The 'general rule' . . . is that a defendant is not entitled to have his indictment dismissed before trial simply because the Government 'acquire[d] incriminating evidence in violation of the [rule],' even if the 'tainted evidence was presented to the grand jury' "); *United States* v. *Blue, supra,* at 255 n. 3.

## II

A person who has been indicted on the basis of incompetent or illegal evidence has suffered demonstrable prejudice. By contrast, the prejudice suffered by a defendant who has been indicted by an unconstitutionally chosen grand jury is speculative at best, and more likely nonexistent. But there are, of course, other interests implicated when a State systematically excludes qualified Negroes from grand jury service. Such

---

obtained evidence may be excluded from the trial, but the prosecution is not barred altogether. "So drastic a step might advance marginally some of the ends served by the exclusionary rules, but it would also increase to an intolerable degree interference with the public interest in having the guilty brought to book." *United States* v. *Blue,* 384 U. S. 251, 255.

discrimination denies Negroes the right to participate equally in the responsibilities of citizenship. The compelling constitutional interest of our Nation in eliminating all forms of racial discrimination requires that no group of qualified citizens be excluded from participation as either grand or petit jurors in the administration of justice.

These interests can be fully vindicated, however, by means other than setting aside valid criminal convictions. This Court has held, for example, that Negroes can obtain injunctive relief to remedy unconstitutional exclusion from grand or petit jury service. *Carter* v. *Jury Comm'n of Greene County,* 396 U. S. 320; *Turner* v. *Fouche,* 396 U. S. 346. That remedy has the advantage of allowing the members of the class actually injured by grand jury discrimination to vindicate their rights without the heavy societal cost entailed when valid criminal convictions are overturned.[5] Moreover, Congress has made it a criminal offense for a public official to exclude any person from a grand or petit jury on the basis of his or her race. 18 U. S. C. § 243.[6] Defendants may also have pretrial remedies against unlawful indictments. But, as Mr. Justice Jackson stated in the *Cassell* case, "[i]t hardly lies in

---

[5] That Negroes are the class most directly affected by grand jury discrimination was first recognized by this Court in the landmark case of *Strauder* v. *West Virginia,* 100 U. S. 303. The Court stated:

"The very fact that colored people are singled out and expressly denied by a statute all right to participate in the administration of the law, as jurors, because of their color, though they are citizens, and may be in other respects fully qualified, is practically a brand upon them, affixed by the law, an assertion of their inferiority, and a stimulant to that race prejudice which is an impediment to securing to individuals of the race that equal justice which the law aims to secure to all others." *Id.,* at 308.

Since qualified Negroes can now vindicate their rights directly, the rationale for allowing a defendant who has been convicted by a constitutional petit jury to assert the rights of Negroes who were excluded from the grand jury has been undermined.

[6] The constitutionality of this statute was upheld in *Ex parte Virginia,* 100 U. S. 339.

the mouth of à defendant whom a fairly chosen trial jury has found guilty beyond reasonable doubt, to say that his indictment is attributable to prejudice." 339 U. S., at 302.

For all these reasons, I believe that a claim of discrimination in the selection of a grand jury or its foreman is not a ground for setting aside a valid criminal conviction. Accordingly, I concur only in the judgment.

MR. JUSTICE POWELL, with whom MR. JUSTICE REHNQUIST joins, concurring in the judgment.

I agree that respondents' convictions should not be overturned. As the Court holds, respondents failed to show a prima facie case of discrimination in the selection of the foreman of the grand jury that indicted them. A more fundamental reason exists, however, for reversing the judgment of the Court of Appeals. Respondents were found guilty of murder beyond a reasonable doubt by a petit jury whose composition is not questioned, following a trial that was fair in every respect. Furthermore, respondents were given a full and fair opportunity to litigate in the state courts their claim of discrimination. In these circumstances, allowing an attack on the selection of the grand jury in this case is an abuse of federal habeas corpus.

Whenever a federal court is called upon by a state prisoner to issue a writ of habeas corpus, it is asked to do two things that should be undertaken only with restraint and respect for the way our system of justice is structured. First, as one court of general jurisdiction, it is requested to entertain a collateral attack upon the final judgment of another court of general jurisdiction. Second, contrary to principles of federalism, a lower federal court is asked to review not only a state trial court's judgment, but almost invariably the judgment of the highest court of the State as well.[1] These con-

---

[1] Both advocates and opponents of broad federal habeas corpus relief have recognized the unusual role the Great Writ plays in our federal sys-

siderations prompt one to inquire, more critically than this Court ever has, whether it is appropriate to allow the use of habeas corpus by state prisoners who do not seek to protect their personal interest in the justness of their convictions.

I

The history and purpose of the writ of habeas corpus do not support the application of the writ suggested by five Members of the Court today. Originally, this writ was granted only when the criminal trial court had been without jurisdiction to entertain the action. See, *e. g., Ex parte Watkins,* 3 Pet. 193, 202 (1830); *Schechtman* v. *Foster,* 172 F. 2d 339 (CA2 1949), cert. denied, 339 U. S. 924 (1950); *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 254 (1973) (POWELL, J., concurring); Oaks, Legal History in the High Court—Habeas Corpus, 64 Mich. L. Rev. 451, 468 (1966); Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 466 (1963) (hereinafter Bator). Subsequently, the scope of the writ was modestly expanded to encompass those cases where the defendant's federal constitutional claims had not been considered in the state-court proceeding. See *Frank* v. *Mangum,* 237 U. S. 309 (1915). In recent years, this Court has extended habeas corpus far beyond the historical uses to which the writ was put. Today, federal habeas is granted in a variety of situations where, although the trial court plainly had jurisdiction over the case, and the defendant's constitutional claims were fully and fairly considered by the state courts, some sort of constitutional error is found to have been committed. *E. g., Brown* v. *Allen,* 344 U. S. 443 (1953); see *Fay* v. *Noia,* 372 U. S. 391, 449–463 (1963) (Harlan, J., dissenting).

tem. See Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 463 (1963); Reitz, Federal Habeas Corpus: Impact of an Abortive State Proceeding, 74 Harv. L. Rev. 1315, 1330–1331 (1961).

I do not suggest that we should revert to the 19th-century conception of the writ and limit habeas corpus to those circumstances where the trial court lacked jurisdiction to enter a competent judgment.  In expanding the scope of habeas corpus, however, the Court seems to have lost sight entirely of the historical purpose of the writ.  It has come to accept review by federal district courts of state-court judgments in criminal cases as the rule, rather than the exception that it should be.  Federal constitutional challenges are raised in almost every state criminal case, in part because every lawyer knows that such claims will provide nearly automatic federal habeas corpus review.  If we now extend habeas corpus to encompass constitutional claims unrelated to the fairness of the trial in which the claimant was convicted, we will take another long step toward the creation of a dual system of review under which a defendant convicted of crime in a state court, having exhausted his remedies in the state system, repeats the process through the federal system.  The extent to which this duplication already exists in this country is without parallel in any other system of justice in the world.[2]

We simply have not heeded the admonition of thoughtful scholars that federal habeas corpus should not be "made the instrument for re-determining the merits of all cases in the legal system that have ended in detention."  P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 1428 (2d ed. 1973); see Bator 446–448.  Today's case is an extreme example of this loss of historical perspective.  In extending use of the writ to circumstances wholly unrelated to its purpose, the Court would move beyond anything heretofore

---

[2] Not only may the state claimant have a "rerun" of his conviction in the federal courts, but also there is no limit to the number of habeas corpus petitions such a claimant may file.  The jailhouse lawyers in the prisons of this country conduct a flourishing business in repetitive habeas corpus petitions.  It is not unusual to see, at this Court, a score or more of petitions filed over a period of years by the same claimant.

decided in our cases. It is true that on a number of occasions this Court has considered state grand jury discrimination, but no prior decision fairly can be viewed as authority for federal habeas corpus review in the absence of a challenge to the fairness of the trial itself. *Strauder* v. *West Virginia*, 100 U. S. 303 (1880), and all of its progeny, involved cases in which the composition of both the grand and petit juries was challenged, so that the integrity of the trial itself was at issue. In cases such as *Pierre* v. *Louisiana*, 306 U. S. 354 (1939), and *Hill* v. *Texas*, 316 U. S. 400 (1942), the question of discrimination in selection of the grand jury was presented on direct appeal, and there was no occasion to consider the propriety of federal collateral attack. Finally, in *Castaneda* v. *Partida*, 430 U. S. 482 (1977), the charge of grand jury discrimination was before the Court on habeas corpus, but the propriety of the use of habeas corpus to assert the claim was not raised, and hence was not decided. *Id.*, at 508 n. 1 (POWELL, J., dissenting). Until today, therefore, it has been an open question whether federal habeas corpus could be granted a state prisoner solely because the prisoner's grand jury was discriminatorily chosen.[3]

## II

The Court makes no pretense of arguing that either the history or purpose of the writ of habeas corpus supports its extension to a case such as this, where the claimant concededly was found guilty after a fair trial. Rather, the Court looks to the policies of the Fourteenth Amendment for justification, noting that the Amendment's purpose was to eliminate racial discrimination such as respondents here al-

---

[3] Although the opinion of the Court discusses the extension of habeas corpus to claims of grand jury discrimination, this discussion is unnecessary in view of the Court's conclusion that no prima facie case of discrimination was made out by respondents. Indeed, it may fairly be questioned whether Part II of the opinion is part of the holding of the Court, for not all of the four Members who join it support even the Court's judgment.

lege.[4]  Apart from the fact that other, more appropriate means are available for attacking discrimination in the selection of grand juries,[5] the Fourteenth Amendment is irrelevant to a principled determination of when the writ of habeas corpus is a proper remedy.  I know of nothing in the language or history of the Fourteenth Amendment, or the civil rights statutes implementing it, that suggests some special use of. the writ of habeas corpus.  If, however, we are to assume that it is open to this Court to extend the writ to cases in which the guilt of the incarcerated claimant is not an issue, at least we should weigh thoughtfully the societal costs that may be involved.  As some of these were fully addressed in my concurring opinion in *Schneckloth* v. *Bustamonte*, 412 U. S. 218 (1972), I now mention the principal costs only briefly.

### A

Because habeas corpus is a unique remedy which allows one court of general jurisdiction to review the correctness of the judgment of another court of general jurisdiction, its exercise entails certain costs inherent whenever there is dual

---

[4] The Court explicitly bases its extension of habeas corpus in this case upon its conclusion that the constitutional interests involved in a claim of grand jury discrimination are "more compelling" than those involved in other constitutional claims.  See *ante*, at 564.  It is not clear, however, that it would be possible to cabin the Court's rule to cases where racial discrimination is alleged.  There are, of course, numerous constitutional challenges to grand jury indictments that have nothing to do with racial discrimination.  The logic of the Court's position may lead to the extension of habeas corpus to every conceivable constitutional defect in indictments.

[5] As MR. JUSTICE STEWART points out, a federal statute makes it a crime to discriminate on the basis of race in the selection of jurors, 18 U. S. C. § 243, and both Government and private actions may be brought by those improperly excluded from jury service.  See *Carter* v. *Jury Comm'n of Greene County*, 396 U. S. 320 (1970).  Furthermore, in the past this Court has allowed a claim of grand jury discrimination to be made on direct appeal from a conviction.  See *Cassell* v. *Texas*, 339 U. S. 282 (1950).  But see n. 9, *infra*.

review. It is common knowledge that prisoner actions occupy a disproportionate amount of the time and energy of the federal judiciary. In the year ending June 30, 1978, almost 9,000 of the prisoner actions filed were habeas corpus petitions. See 1978 Annual Report of the Director of the Administrative Office of the United States Courts 76. Apart from the burden of these petitions, many of which are frivolous, collateral review can have a particularly deleterious effect upon both the deterrent and rehabilitative functions of the criminal justice system. See *Wainwright* v. *Sykes,* 433 U. S. 72, 90 (1977); *Sanders* v. *United States,* 373 U. S. 1, 24–25 (1963) (Harlan, J., dissenting); Bator 452, Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 146 (1970).

Perhaps the most serious cost of extending federal habeas corpus review of state judgments is the effect upon the federal structure of our government.[6] Mr. Justice Black has emphasized the importance of

"a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the

---

[6] The Court suggests that "federalism concerns . . . are not present" when the fairness of an indictment is challenged on federal habeas, because "[f]ederal courts have granted relief to state prisoners upon proof of the proscribed discrimination for nearly a century. See, *e. g., Virginia* v. *Rives,* 100 U. S. [313,] 322 [(1880)]." *Ante,* at 562. There is no logic to this reasoning. The mere fact that federal courts have reviewed some state-court decisions for nearly a century hardly supports a conclusion that no federalism concerns exist. Nor does *Virginia* v. *Rives* support the Court's argument. In that case, the petitioner challenged the composition of his *petit* jury, as well as that of the grand jury that had indicted him. Whenever the fairness of the petit jury is brought into question doubts are raised as to the integrity of the process that found the prisoner guilty. See *Cassell* v. *Texas, supra,* at 301–302 (Jackson, J., dissenting). Collateral relief therefore may be justified even though it entails some damages to our federal fabric. See *infra,* at 586.

States and their institutions are left free to perform their separate functions in their separate ways." *Younger* v. *Harris,* 401 U. S. 37, 44 (1971).

See also *National League of Cities* v. *Usery,* 426 U. S. 833, 844 (1976); *Schneckloth* v. *Bustamonte, supra,* at 264–265 (POWELL, J., concurring). Nowhere has a "proper respect for state functions" been more essential to our federal system than in the administration of criminal justice. This Court repeatedly has recognized that criminal law is primarily the business of the States, and that absent the most extraordinary circumstances the federal courts should not interfere with the States' administration of that law. See, *e. g., Younger* v. *Harris, supra; Perez* v. *Ledesma,* 401 U. S. 82 (1971).

The overextension of habeas corpus by federal courts does more than simply threaten the essential role of the States in our federal system. It runs afoul of the very principle of primary state jurisdiction over the criminal laws that the Court repeatedly has asserted. This interference with state operations is not merely academic. The review by a single federal district court judge of the considered judgment of a state trial court, an intermediate appellate court, and the highest court of the State, necessarily denigrates those institutions.[7]

## B

The Court's expansion of our dual system of review therefore inflicts substantial costs on society, our system of justice,

---

[7] The Court implies that state trial judges cannot be trusted to rule fairly on the issue here presented, because they are involved administratively in the selection of the grand jury. *Ante,* at 561, 563. This is a view I find wholly unacceptable. In numerous circumstances, trial judges are called upon to rule on the validity of their own judicial and administrative action. I know of no general constitutional rule requiring disqualification in such cases. I certainly would not accept an assumption at this point in our history that state judges in particular cannot be trusted fairly to consider claims of racial discrimination. See *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 263–264, n. 20 (1973) (POWELL, J., concurring).

and our federal fabric. When the claim being vindicated on federal habeas corpus is that the individual claimant is being unjustly incarcerated, these costs are justified, for the very purpose of the Great Writ is to provide some means by which the legality of an individual's incarceration may be tested. See *Preiser* v. *Rodriguez,* 411 U. S. 475 (1973); *McNally* v. *Hill,* 293 U. S. 131, 136–137 (1934); *Schneckloth* v. *Busta-monte,* 412 U. S., at 252–256 (POWELL, J., concurring). Indeed, it is only by providing a means of releasing prisoners from custody that we can assure that no innocent person will be incarcerated, a pre-eminent objective of our criminal justice system. See *Jackson* v. *Virginia, ante,* at 315–316; *In re Winship,* 397 U. S. 358, 371 (1970) (Harlan, J., concurring).

Preventing discrimination in the selection of grand juries also is a goal of high priority in our system.[8] But the question is not simply, as the Court seems to think, whether the goal and the interests it serves are important. Habeas corpus is not a *general* writ meant to promote the social good or vindicate all societal interests of even the highest priority. The question rather is whether this ancient writ, developed by the law to serve a precise and particular purpose, properly may be employed for the furthering of the general societal goal of grand jury integrity. For the provision of indictment by grand jury does not protect innocent defendants from unjust convictions. Rather, it helps to assure that innocent persons will not be made unjustly to stand trial at all. Once

---

[8] The Court also would justify collateral review of claims of grand jury discrimination because of the damage that such discrimination can do to the perceived integrity of the judicial system as a whole. But it ignores the damage done to society's perception of the criminal justice system by allowing valid convictions to be reversed on collateral attack on the basis of claims having nothing to do with the defendant's guilt or innocence. Moreover, any discriminatory action so notorious as to undermine the public's faith in the fairness of the judiciary is likely to be remedied on direct review by the state courts and by this Court.

a defendant is found guilty beyond a reasonable doubt by a fairly drawn petit jury, following a fair trial, he hardly can claim that it was unjust to have made him stand trial.[9]  Because the need to protect the innocent from incarceration is not implicated in cases such as this, the writ of habeas corpus is not an appropriate remedy.  Other remedies can be, and have been, provided to protect society's interest in eliminating racial discrimination in the selection of those who are to serve on grand juries.  See n. 5, *supra*.[10]

---

[9] Although I need not reach the question in this case, I find much of what MR. JUSTICE STEWART says persuasive on the question whether complaints concerning the fairness of indictment should survive conviction even for purposes of direct appeal.  See *ante*, p. 574.  In his dissenting opinion in *Cassell* v.. *Texas*, Mr. Justice Jackson suggested that "any discrimination in selection of the grand jury in this case, however great the wrong toward qualified Negroes of the community, was harmless to this defendant."  339 U. S., at 304.  Until today this Court never has undertaken to answer Mr. Justice Jackson's arguments in *Cassell*.  Nor am I completely satisfied with today's attempt.  For purposes of this opinion, however, I shall assume that direct review of respondents' claims was appropriate.

[10] Finding no support in our prior decisions for today's extension of habeas corpus, the Court considers only whether our decision in *Stone* v. *Powell*, 428 U. S. 465 (1976), forbids federal courts to grant habeas corpus in cases such as this.  *Stone*, of course, did not address the proper method for presenting claims of grand jury discrimination, as it involved only claims under the Fourth Amendment exclusionary rule.  Nonetheless, the Court overstates the differences between *Stone* and the present case. See *ante*, at 560–564.  To be sure, in *Stone* v. *Powell, supra,* at 495 n. 37, we emphasized that the Fourth Amendment exclusionary rule was a "judicially created remedy rather than a personal constitutional right."  We did so, however, only in rejecting the suggestion of the dissent that our decision would lead to a "drastic withdrawal of federal habeas jurisdiction," 428 U. S., at 517, the extent of which might be unlimited.  *Stone* recognized that the Fourth Amendment exclusionary rule was not designed to protect the right of an individual to be free from unjust conviction.  Thus, the justification for undermining the finality of state-court judgments that exists in many habeas corpus actions was absent.  Properly understood, therefore, the rationale of our decision in *Stone* is not only

## III

In sum, I view the Court's extension today of federal habeas corpus to be wholly at odds with the history and purpose of the writ. Furthermore, any careful analysis of the costs and benefits of the Court's approach plainly shows that habeas corpus should not be available for the vindication of claims, such as respondents' grand jury discrimination claim, that have nothing to do with the fairness of the claimant's conviction. Courts often are tempted to reach for any available remedy when they have before them a claim of intrinsic importance. In my view, however, this is an unprincipled way in which to administer the judicial process, especially when other remedies are available to protect the interests at stake. I therefore would hold that a challenge to the composition of a state prisoner's grand jury cannot be raised in a collateral federal challenge to his incarceration, provided that a full and fair opportunity was provided in the state courts for the consideration of the federal claim.

MR. JUSTICE WHITE, with whom MR. JUSTICE STEVENS joins, dissenting.

Although I agree with Parts I and II of the Court's opinion, I believe that a prima facie case of purposeful discrimination was made out and was not rebutted by the State. I therefore dissent from Parts III and IV and from the judgment. On the basis of the evidence presented at the evidentiary hearing in state court, the District Court concluded that respondents "appear[ed]" to have made out a prima facie case of discrimination in the selection of the foreman of the grand

---

consistent with denying collateral relief for claims of unfair indictment, but actually presages such a limitation on habeas corpus. For, as I have stated in the text above, the right not to be indicted by a discriminatorily selected grand jury, like the right not to have improperly obtained, but highly probative, evidence introduced at trial, has nothing to do with the guilt or innocence of the prisoner.

on

jury that indicted them.  App. 99.  However, upon the affidavits submitted by the State in response, the court concluded that in fact the foreman had been chosen for other than racial reasons, that he had not voted on the indictment, and thus that there had not been a violation of the Equal Protection Clause.  *Id.*, at 122.  The Court of Appeals agreed that a prima facie case was shown, interpreting the record testimony to the effect that the recollections of those testifying were that there had never been a black chosen as foreman of a grand jury in Tipton County, and pointing out the potential for discrimination in a system which leaves the selection of the foreman to the discretion of a single judge who has not "really given any thought to appointing" a black, *id.*, at 113.  See 570 F. 2d 129, 134–135 (1978).  The Court of Appeals disagreed, however, that this prima facie case had been rebutted by the testimony of the selecting judge that he had "no feeling against" appointing a black to be foreman, and found irrelevant that the foreman did not vote on respondents' indictment.  *Id.*, at 131.  Because we do not sit to redetermine the factfindings of lower courts, and because the Court of Appeals correctly enunciated and applied the law governing proof of discrimination in the context of grand jury selection, I dissent.

The only difference between this case and our previous cases voiding a conviction due to discriminatory selection of members of the grand jury is that in this case it has been shown only that the grand jury foreman, who did not vote on the indictment, was chosen in a manner prohibited by the Equal Protection Clause.  I agree with the Court of Appeals that given the vital importance of the foreman in the functioning of grand juries in Tennessee,[1] a conviction based on an

---

[1] See 570 F. 2d 129, 136 (1978):

"The foreman or forewoman is vitally important to the functioning of grand juries in Tennessee, being 'the thirteenth member of each grand jury organized during his term of office, having equal power and author-

indictment where the foreman was chosen in a discriminatory fashion is void just as would be a conviction where the entire grand jury is discriminatorily selected, whether or not there is a showing of actual prejudice, see *Castaneda* v. *Partida*, 430 U. S. 482 (1977); *Alexander* v. *Louisiana*, 405 U. S. 625 (1972); *Arnold* v. *North Carolina*, 376 U. S. 773 (1964); *Eubanks* v. *Louisiana*, 356 U. S. 584 (1958); *Cassell* v. *Texas*, 339 U. S. 282 (1950); *Patton* v. *Mississippi*, 332 U. S. 463 (1947); *Hill* v. *Texas*, 316 U. S. 400 (1942); *Pierre* v. *Louisiana*, 306 U. S. 354 (1939); *Bush* v. *Kentucky*, 107 U. S. 110 (1883).

That this case involves only the foreman, rather than the entire grand jury, does have implications for the manner in which respondents may meet their burden of proving discrimination. In the context of racial discrimination in the selection of juries, "the systematic exclusion of Negroes is itself such an 'unequal application of the law . . . as to show intentional discrimination,'" a necessary component of any equal protection violation. *Washington* v. *Davis*, 426 U. S. 229, 241 (1976). Generally, in those cases in which we have found unconstitutional discrimination in jury selection, those alleging discrimination have relied upon a significant statistical discrepancy between the percentage of the underrepresented group in the population and the percentage of this group called to serve as jurors, combined with a selection procedure "that is susceptible of abuse or is not racially neutral." *Castaneda* v. *Partida, supra,* at 494. See, *e. g., Alexander* v. *Louisiana, supra; Turner* v. *Fouche,* 396 U. S. 346 (1970); *Carter* v. *Jury Comm'n,* 396 U. S. 320 (1970). Once this

ity in all matters coming before the grand jury with the other members thereof.' Tenn. Code Ann. § 40–1506. He or she is expected to assist the district attorney in investigating crime, may administer oaths to all witnesses, conduct the questioning of witnesses, must indorse and sign all indictments, and like every other chairperson is in a position to guide, whether properly or improperly, the decision-making process of the body. . . ." (Footnote omitted.)

showing is made, the burden shifts to the State to rebut the inference of discriminatory purpose. *Castaneda* v. *Partida, supra,* at 495. This method of proof, sometimes called the "rule of exclusion," 430 U. S., at 494, may not be well suited when the focus of inquiry is a single officeholder whose term lasts two full years, as is true of the Tipton County grand jury foreman. For instance, in *Castaneda* v. *Partida,* we considered statistics relating to an 11-year period showing that 39% of the 870 persons selected for grand jury duty were Hispanic, from a general population that was over 79% Hispanic. The likelihood that this statistical discrepancy could be explained on the basis of chance alone was less than 1 in $10^{140}$. See *id.,* at 495–496, and n. 17. The sample size necessarily considered in a case of discrimination in the selection of a foreman simply does not permit a statistical inference as overwhelming as that in *Castaneda.* During any 11-year period, there would be only five or six opportunities for selecting jury foremen in Tipton County, assuming that every foreman selected serves at least the full 2-year term.[2]

Despite the inherent difficulty of any statistical presentation with respect to discrimination in filling a particular grand jury spot, respondents nonetheless have made a strong showing of underrepresentation supporting an inference of purposeful discrimination. This Court is not in a position to reject the finding, explicitly made by the Court of Appeals and implicitly made by the District Court,[3] that those who testified believed

---

[2] The key numbers to compare are the number of blacks selected to be foremen and the total number of opportunities to select a foreman. The latter number may be greater than the number of different individuals who serve if the appointing judge has an inclination to reappoint those who have previously served.

[3] The District Court did not make written findings of fact explaining the basis of its conclusion that a prima facie case appeared to have been established. However, the Court of Appeals was in a position to dispose of the appeal, without the necessity of a remand to the District Court, because the record and the District Court's conclusions of law clearly

there had never been a black foreman during the period 1951–1973. See *Berenyi* v. *Immigration Director,* 385 U. S. 630, 635 (1967); *Graver Mfg. Co.* v. *Linde Air Products Co.,* 336 U. S. 271, 275 (1949). Assuming that 11 foreman selections were made during this period,[4] the expected number of black foremen would be more than 3—and the likelihood of no blacks being chosen would be less than 1 in 50—if blacks, who constituted nearly a third of the county's population, and whites had an equal.chance of being selected. I do not see how respondents ·could be expected to make a stronger statistical showing.[5]

In any event, any possible weakness in respondents' statistical presentation was more than overcome by the additional evidence before the District Court. First, the selection of a foreman is left to the complete discretion of a single person—the circuit judge. The potentialitiès for abuse in such a system are obvious, cf. *Castaneda* v. *Partida, supra,* at 497; *Carter* v. *Jury Comm'n, supra; Hernandez* v. *Texas,* 347 U. S. 475, 479 (1954) ("key man" system). Moreover, the particular judge who chose the foreman of respondents' grand jury had

---

reveal the basis for its conclusion, see *Finney* v. *Arkansas Board of Correction,* 505 F. 2d 194 (CA8 1974). This was the failure of any of the foremen who testified at the state-court hearing to recollect there having been a black foreman, and the inference therefrom—not clearly erroneous, see Fed. Rule Civ. Proc. 52 (a)—that these witnesses believed there had never been a black foreman.

[4] See n. 2, *supra.*

[5] If there were any doubt that the evidence adduced in the state-court hearing on respondents' plea in abatement was insufficient—perhaps because it did not unequivocally establish the race of every foreman chosen since 1950—the appropriate course would be for the District Court to hold an evidentiary hearing. See *Townsend* v. *Sain,* 372 U. S. 293, 313 (1963) (evidentiary hearing must be held "unless the state-court trier of fact has after a full hearing reliably found the relevant facts"); 28 U. S. C. § 2254 (d)(3) (determination of merits of factual issue by state court shall be presumed to be correct unless it appears "that the material facts were not adequately developed at the State court hearing").

never chosen a black in any of the five counties for which he appointed foremen over a 6-year period, App. 113. Finally, the judge himself admitted that he had never even considered appointing a black foreman. *Ibid.*[6] Although these facts are not necessarily inconsistent with an ultimate conclusion that respondents' foreman was not chosen on racial grounds, they raise, in conjunction with the previously described statistical presentation, a strong inference of intentional racial discrimination, shifting the burden to the State. Clearly the Court of Appeals is correct that the Circuit Judge's further self-serving statement that he had "nothing against" appointing blacks is not sufficient rebuttal, see *Alexander* v. *Louisiana,* 405 U. S., at 632; *Turner* v. *Fouche,* 396 U. S., at 361; *Hernandez* v. *Texas, supra,* at 481–482. It can hardly be said that the judge, as the official authorized by the State to appoint grand jury foremen, performed his "constitutional duty . . . not to pursue a course of conduct in the administration of [his] office which would operate to discriminate in the selection of jurors on racial grounds." *Hill* v. *Texas,* 316 U. S., at 404.

Mr. Justice Stevens, dissenting in part.

Mr. Justice Stewart's opinion prompts me to explain that by joining Part II of the Court's opinion I do not necessarily indicate that I would have rejected the arguments set forth in Mr. Justice Jackson's dissenting opinion in *Cassell* v. *Texas,* 339 U. S. 282, 298, if I had been a Member of the Court when the issue was first addressed. But there is surely enough force to Mr. Justice Blackmun's reasoning to require adherence

---

[6] Clearly, it is irrelevant that the admissions on the part of the selecting judge that he had never given thought to appointing, and indeed had never appointed, a black foreman came as part of the petitioner's written response to respondents' petitions for writs of federal habeas corpus. In ascertaining whether a plaintiff has carried his burden of proof, all the evidence must be considered. It is not unusual that an affidavit or other evidence submitted by one party to a lawsuit turns out to be of primary, and perhaps even determinative, aid to the other party.

to a course of decision that has been consistently followed by this Court since 1880.

The doctrine of *stare decisis* is not a straitjacket that forecloses re-examination of outmoded rules. The doctrine does, however, provide busy judges with a valid reason for refusing to remeasure a delicate balance that has tipped in the same direction every time the conflicting interests have been weighed.

The *stare decisis* considerations that weigh heavily in my decision to join Part II of the Court's opinion also support MR. JUSTICE WHITE's opinion dissenting from Parts III and IV. Accordingly, I join his dissent.