**Hubert L. SHEFFIELD, Petitioner,**

v.

**Larry LACK, etc., et al., Respondents.**

**Civ. A. No. 3:87–0779.**

United States District Court,
M.D. Tennessee,
Nashville Division.

Dec. 1, 1987.

Opinion after Answer March 22, 1988.

Hubert Sheffield, Nashville, Tenn., pro se.

Jerry Smith, Nashville, Tenn., James W. Thompson, Asst. Attys. Gen., Jackson, Tenn., for respondents.

### MEMORANDUM OPINION AND ORDER

NEESE, District Judge.

This is the second *pro se* application made to this Court for the federal writ of habeas corpus by the petitioner Mr. Hubert Sheffield. His first petition was dismissed for his failure to have exhausted available state-remedies. *See, Hubert Sheffield,* petitioner, *v. Larry Lack, et al.,* respondents,

civil action no. 3:87–0496, order of July 15, 1987.

Mr. Sheffield in his second habeas corpus petition has now eliminated apparently those claims which were held by this Court to be unexhausted. He claims now that he is in the custody of the respondent-warden pursuant to the judgment of conviction of March 25, 1981 of the Criminal Court of Tennessee for its 30th judicial district (comprising Shelby County), in violation of the federal Constitution, Sixth and Fourteenth Amendments. 28 U.S.C. §§ 2241(c)(3), 2254(a).

Mr. Sheffield contends herein that his trial-Court committed some 22 errors during his trial and the resulting penalty-stage in a violation of his rights under the Constitution, Sixth Amendment, to confront witnesses against him and to be tried by a fair and impartial jury. He contends this aggregation of errors deprived him of his federal right to the due process of law.

"[T]he right of confrontation * * * is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Pointer v. State of Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), quoted in *Barber v. Page,* 390 U.S. 719, 721, 88 S.Ct. 1318, 1320[2], 20 L.Ed.2d 255 (1968). "No State shall * * * deprive any person of * * * liberty * * * without due process of law * * *." Constitution, Fourteenth Amendment. " * * * 'A fair trial in a fair tribunal is a basic requirement of due process.' * * *" *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1942[3], 6 L.Ed.2d 751 (1961).

As it does not appear plainly on preliminary consideration of the face of the applicant's current petition that he is not now entitled to relief in this Court, Rule 4, Rules—§ 2254 Cases, it hereby is

ORDERED that the respondent-warden file an answer comporting with Rule 5, Rules—§ 2254 Cases, within 23 days herefrom, and that a copy of the petition herein and of this order be served forthwith by the clerk of this Court by certified-mail on the respondent-warden and the attorney-general and reporter of Tennessee. Rule

4, Rules—§ 2254 Cases. The noticed slow movement of the mail provides good cause for the additional time allowed. 28 U.S.C. § 2243; Rule 81(a)(2), F.R.Civ.P.

## OPINION AFTER ANSWER

The respondent answered, *see* order herein of December 1, 1987. It appears from the record that the petitioner has exhausted his available state remedies. 28 U.S.C. § 2254(b).

Mr. Sheffield claims that his trial-Court erred in refusing to dismiss the indictment returned against him based upon the unconstitutionality of Tennessee's death-penalty statute. "[T]he Tennessee death penalty statute is constitutional * * *." *State v. Nelson*, 638 S.W.2d 342, 368[48] (Tenn. 1982), *cert. den.*, 459 U.S. 1137, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983). As there is no contention herein that such statute was applied against Mr. Sheffield arbitrarily, this claim has no merit.

Mr. Sheffield claims that his trial-Court erred in refusing to dismiss the indictment returned against him, because there was discrimination based upon gender in the selection of the grand-jury foreperson. To show that a federal-constitutional and equal-protection violation has occurred in the context of the selection of the foreperson of a grand jury, it must have been shown that "the procedure employed resulted in substantial underrepresentation of * * * the identifiable group to which he belongs." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), quoted in *Rose v. Mitchell*, 443 U.S. 545, 565, 99 S.Ct. 2993, 3005[4], 61 L.Ed.2d 739 (1979).

■ Mr. Sheffield, a male, lacks the standing to challenge the alleged discrimination against females in the selection of the foreperson of the grand jury which indicted him. *Beal v. Rose*, 532 F.Supp. 306, 313 [4] (D.C.Tenn.1981). This claim, thus, has no merit.

Mr. Sheffield claims also that his trial-Court erred in sustaining the prosecution's challenge for cause of six persons on his venire, in that such persons on his venire did not state unequivocally that he or she was committed irrevocably to vote against infliction of the death-penalty irrespective of the facts and circumstances that might emerge in the course of the proceedings. "Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position," *Witherspoon v. State of Illinois*, 391 U.S. 510, 515, 88 S.Ct. 1770, 1774[2], 20 L.Ed.2d 776 (1968), thereby rendering them subject to disqualification from serving on a jury.

The Supreme Court of Tennessee found factually that, while at times each of the challenged jurors "gave confusing and sometimes inconsistent responses, their final unequivocal positions rendered each of them subject to dismissal." *State v. Sheffield*, 676 S.W.2d 542, 548[3] (Tenn.1984). This finding is presumed by this Court to be correct, 28 U.S.C. § 2254(d), as none of the conditions of sub–§'s (1)–(8), inclusive, is claimed to have been extant by the petitioner. *See also, Loveday v. Davis*, 697 F.2d 135, 138[1] (6th Cir.1983). This issue has no merit.

■ Mr. Sheffield claims that his conviction was obtained in violation of his federal-constitutional right to the due process of the law, because the process of death-qualifying large groups of jurors is prejudicial innately. The Supreme Court of the United States has not addressed this specific issue; however, such Court has held that death qualification of a jury does not violate the fair cross-section requirement of the fair and impartial jury requirement of the Sixth Amendment to the United States Constitution "so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *Lockhart v. McCree*, 476 U.S. 162, 184, 106 S.Ct. 1758, 1770[4], 90 L.Ed.2d 137 (1986). Mr. Sheffield has not shown he has available any evidence that his jury failed to apply properly the law to the facts of his particular case, nor has he shown that he was prejudiced by the

death-qualification process. This issue has no merit.

█ He also claims that there is insufficient evidence to support the verdict of guilt returned against him. "[I]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 * * * the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2791–2792, 61 L.Ed.2d 560 (1979), *reh. den.*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979). In order to make the above determination, the Court is required to view "the evidence in the light most favorable to the prosecution." *Id.*, 443 U.S. 319, 99 S.Ct. 2789.

To have convicted Mr. Sheffield of murder in the first degree, the jury was required to have found that he committed a willful, deliberate, malicious and premeditated killing. T.C.A. § 39–2–202.

The pertinent facts on that issue, as stated by the Supreme Court of Tennessee, follow:

"Ruby Marlar and her husband Hill Marlar lived on Addison Street near the National Cemetery in Memphis. Their house was just a half block from Whittier Street, where defendant and his friend William Pratere, one of the principal witnesses, lived.

"On New Year's Eve, December 31, 1979, Mr. and Mrs. Marlar began celebrating at 5:00 p.m. They visited Nita's Lounge, the Viaduct Lounge and Knight's Cafe, where Mrs. Marlar worked part time but she was not working on New Year's Eve. About 2:00 a.m. Mr. Marlar went home, by mutual agreement, having made arrangements for someone to drive Mrs. Marlar home. Mr. Marlar had been asleep about two hours when he heard his wife knocking on the door, but by the time he opened it, she was gone. He was not disturbed because her brother lived about one and a half blocks away and on previous occasions she had walked to her brother's house and spent the night. If that was her destination that morning, she did not get

there because she had an encounter with defendant, 'Butch' Sheffield, or his friend Gary Haning, or both of them. Her body was discovered beside a dirt road near Lakeland Lake in Shelby County, on January 5, 1980, with a seven inch incision to her neck that almost severed her head from her body and, of course, caused her death. Tests revealed seminal fluid and sperm in her vagina and anus and saliva on her breast and a blood alcohol level of 0.51%.

"Gary Haning testified that he had been given a life sentence for his participation in the murder of Mrs. Marlar and that the State had made no deal with him other than that he would not be incarcerated in the same facility as defendant and that the attorney general would write the parole board to the effect that he had testified under 'difficult circumstances.'

"Gary Haning's version of the events that culminated in the murder of Ruby Marlar was that he had gone to sleep at Mike Pratere's house, woke up cold, went to the heater, fell and burned his leg and back; that Mike and defendant came in about 3:00 a.m., defendant left for a while and Mike bandaged his burns. Defendant returned within thirty or forty minutes and told him that he had a drunk lady in the car and wanted his help to 'con' her out of her money or otherwise take it from her, to which he agreed. He testified that he got in the back seat of defendant's car and defendant drove the three of them out Summer Avenue toward Ellendale. He denied that he had known Ruby Marlar before and said that the lady was mad because her husband would not let her in the house and that defendant had told him he found her walking down the street; that the defendant was ostensibly complying with her request to drive her to her mother's home in Ellendale; that when they passed the turn-off to her mother's house she was upset but defendant told her that he wanted her to go to the door of a house near Lakeland and get a girl to come out, because her father would not allow her to go out with defendant.

"Haning testified that the lady 'was drunker than both of us,' and defendant

drove down near a dock on Ellendale Lake, stopped where they could just see the top of a building that looked like a house and tried to get the lady to leave the car and get his girlfriend to come out. She refused to do that but she accepted Haning's invitation to join him in the back seat and they 'began to have sex.' Defendant was in the front seat, rolled a joint and rifled the victim's purse. When Haning heard the purse hit the floorboard, he stopped having sex and got out of the car. Defendant then got in the rear seat with the victim and after a few minutes Haning heard and saw defendant beating the victim with his fist. He said defendant was beating her because she objected to his 'going at her from behind.' Haning weighed one hundred and ten pounds and defendant weighed two hundred and ten or more, but Haning said he remonstrated with defendant and told him he should not treat the victim that way. According to Haning, defendant got out of the car and told the victim to get out, whereupon he grabbed her by the hair and cut her throat. Haning testified that he could not believe what he had seen. That he was sick, surprised and shocked. He said the defendant drug the victim a short distance down the road, threw out a number of Miller beer cans from the car and they drove away. Haning testified that as he drove away he heard the victim making noises like she was drowning.

"Haning admitted that he had told the police on various occasions, and testified to, different versions of the events of that evening but insisted that his stories had been consistent except that he had left himself out as a participant in various episodes in an attempt to 'beat' his case. He also admitted that he had thrown his hunting knife away in a field near Ripley, Tennessee, shortly after the date of the murder.

"Mike Pratere had only known defendant a few months prior to December 31, 1979; but he and defendant had worked together, contracting and performing painting and flooring jobs. They resided in houses that were only a half block apart on Whittier Street. Pratere testified that he had met Haning for the first time that New Year's Eve when he and defendant stopped by the Haning residence about 10:00 p.m. He described in great detail a fight between Haning and his pregnant wife, highlighted by her breaking the T.V., throwing a machete and firing a gun as the three men left the Haning residence. According to Pratere, Mrs. Haning was upset about the men drinking beer and because her husband and defendant were talking about going to Mississippi and stealing some boat motors.

"Pratere said that he, defendant and Haning went to Pratere's house and left Haning there while he and defendant went to the hospital to be with his diabetic wife at midnight. After the hospital visit he and defendant stopped at the Krystal near Sears to eat and eventually went to the home of a girlfriend of defendant's, Diane Arnold. They left Diane Arnold's house about 4:00 a.m. and drove the short distance to Pratere's house on a flat tire. They discovered that Haning had awakened from his drunken sleep and fallen over a gas heater and burned his right side and back. Pratere further tracked Haning's testimony to the effect that he doctored Haning's burns while defendant was gone to get his own car. Pratere testified that Haning began playing around with a knife and started throwing it in the house. That provoked an argument between them; and when defendant returned, he took Haning's side of the argument; and after whispering something to Haning, the two of them left and Pratere went to bed.

"Pratere testified that he dozed off and was awakened by a dog barking and screams; that he looked out into the street, at an angle in the direction of Ruby Marlar's house [1] and saw defendant holding a woman and Haning with a knife to her throat and 'she was like a rag doll when they threw her in the car.' He elaborated that 'Well, to me, you know, it looked like her throat got cut. To me. That's the way it looked at the time. But she got as limp as a rag and they threw her in the car.' Pratere said they drove off toward the National Cemetery and came back about two hours later, around daybreak, and woke him up. Pratere testified that Han-

ing and defendant's clothes were bloody and when he asked what happened defendant said he ran over somebody.

"On cross examination Pratere acknowledged that in relating an earlier account of those events he had said that he went out in his front yard clad only in his underclothing and started to go across the street where Haning, defendant and the woman were but fell in a ditch; that his next door neighbor, Sidney Gattis, a part time preacher, was standing in his yard and witnessed the throat cutting, the throwing of the limp woman in the car and the departure of the three of them.

"Sidney Gattis was called as a witness and said that he was at home that evening with his wife and two children and neither heard anything unusual nor saw anything unusual during the night or early morning hours of that New Year's Eve and Day.

"Defendant took the stand and gave a different version of his activities and those of Haning and Pratere during the critical morning hours of 4:00 a.m. to 6:00 p.m. He testified that after he transferred the license tags from Pratere's car with a flat tire, to his car, he got more beer, drove Haning around looking for a 'joint' for Haning and finally returned to Pratere's house. Pratere was passed out drunk, defendant had had enough, but Haning wanted to continue looking for a 'joint,' or to go to his house where he had hundreds of pills. Haning asked to use defendant's car, defendant gave his consent, and when Haning left defendant went to sleep on the couch in Pratere's living room. Defendant was awakened about daybreak, approximately 6:00 a.m., by Haning knocking to get in. That testimony, of course, sent Haning out alone in defendant's car for the critical hours when the murder was committed.

"At approximately 7:30 a.m. on January 1, 1980, a fire was observed just inside the wall at the National Cemetery. It was extinguished and found to be a woman's purse containing a still legible social security card and other items indicating that it belonged to Ruby Marlar. The burned purse and its contents were turned over to the police and that initiated the investigation that resulted in the indictment and trial of Haning and defendant.

"Defendant testified that when Haning returned to Pratere's house about 6:00 a.m. he wanted more beer, got in his car with Haning as a passenger and went over to Rakestraws Store by the National Cemetery. They would not sell him any beer and when he came back to the car he saw a woman's purse for the first time. When he asked Haning about it, the response was that Haning had 'ripped off a drunk bitch.' Defendant testified that he reasoned that with his record he could not afford to be charged with purse snatching so he threw the purse over the wall into the National Cemetery and he and Haning went over the wall. Defendant poured some Coleman lighter fluid over the purse and its contents and Haning 'set the match on it.'

"Mr. Marlar testified that his wife weighed about 145 pounds and 'pretty well knew how to take care of herself.'

"Screening tests on defendant's knife by a forensic serologist were positive for blood. A screening test on defendant's jeans revealed the possibility of blood on the right knee. The jeans were wet and smelled of detergent when found."

"[1] Pratere testified that he did not know Ruby Marlar nor where she lived on January 1, 1980, but at the time he testified he knew where she lived and placed the scene which he described as near the corner of Whittier and Addison and between his house and Ruby Marlar's."

*State v. Sheffield,* 676 S.W.2d 542, 544–547 (Tenn.1984).

Considering the testimony of Mr. Haning, that he was an eyewitness to the petitioner's cutting of Mrs. Marlar's throat, the fact that other witnesses contradicted each other, and the fact that Mr. Haning weighed only 110 pounds while Mrs. Marlar weighed 145 pounds and was a woman who could "take care of herself," this Court is unable to say that no rational trier of fact would have believed Mr. Haning's testimony and have found Mr. Sheffield guilty beyond a reasonable doubt. This issue has no merit.

Mr. Sheffield also makes the following claims herein:

—his trial Court erred in failing to grant a new trial because of newly dis-

covered evidence which, if known, allegedly would have affected the verdict of the jury;

—his trial Court erred in instructing his trial counsel not to refer to a "deal" in reference to the testimony of Mr. Haning;

—his trial Court erred in limiting his trial counsel's questioning of Mr. Haning about the possible "agreement" with the prosecution in exchange for his testimony;

—his trial Court erred in not allowing his trial counsel to question Mr. Haning about exchanging his testimony for a favorable consideration of parole.

These are questions of state-law.

■ Errors of state law may not be entertained by a federal court in a habeas corpus proceeding unless, of course, such error is so egregious that it results in a denial of the equal protection or the due process of the law guaranteed by the federal Constitution, Fourteenth Amendment. *Pulley v. Harris,* 465 U.S. 37, 41, 104 S.Ct. 871, 875, 79 L.Ed.2d 29 (1984). The above-purported errors do not arise to that magnitude. These claims have no merit.

■ Mr Sheffield claims additionally that his trial Court erred in allowing the prosecution to introduce and interject into the case evidence that he was in a motel with a 15–year–old girl on the night before his arrest, and that he had a temper when he was drinking. These claims pertain to evidentiary issues, and an "[e]videntiary issue[ ] do[es] not support a petition under [28 U.S.C.] § 2254 unless the introduction of such evidence violates a specific constitutional provision." *Freeman v. Mabry,* 570 F.2d 813, 814 n. 2 (8th Cir.1978), *cert. den.,* 439 U.S. 845, 99 S.Ct. 142, 58 L.Ed.2d 146 (1978), citing *Spencer v. State of Texas,* 385 U.S. 554, 568–569, 87 S.Ct. 648, 656, 17 L.Ed.2d 606 (1967). Mr. Sheffield asserts that the admission of the evidence complained-of hereinabove constituted a violation of his federal-constitutional right to the due process of the law. Constitution, Fourteenth Amendment, § 1.

"As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it [this Court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial." *Lisenba v. People of State of California,* 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941), *reh. den.,* 315 U.S. 826, 62 S.Ct. 620, 86 L.Ed.2d 1222 (1942).

Given the evidence introduced other than that complained-of hereinabove, the Court FINDS that the introduction of the complained-of evidence did not infect fatally Mr. Sheffield's trial, and that he was not deprived of the fair trial he was constitutionally entitled to have had.

Mr. Sheffield claims furthermore that his trial-Court erred in allowing the prosecution to impeach him by use of a prior conviction of manslaughter. "[I]n a criminal case a witness may be cross-examined about a crime which is 'a felony, infamous crime, petit larceny, or a crime involving moral turpitude.' " *Williams v. State of Maryland,* 375 F.Supp. 745, 753 (D.C.Md. 1974). This issue has no merit.

Mr. Sheffield claims also that his trial Court erred in refusing to sustain his objection to the prosecuting attorney's deliberate reference to "parole-time" for one convicted of murder and in refusing to give a curative instruction. The Supreme Court of Tennessee found factually that the trial Court sustained defense-counsel's objection to this reference and found further that the record does not reflect that defense-counsel had ever requested a curative instruction, all contrary to Mr. Sheffield's contention that his trial Court had refused to sustain the objection and refused to give a curative instruction. This finding is presumed correct by this Court, 28 U.S.C. § 2254(d), *supra.* This issue has no merit.

Mr. Sheffield contends also that his trial-Court erred when it charged the jury that one who kills during the perpetration of a felony is guilty of murder in the first degree, while Tennessee's felony-murder statute requires a finding of malice necessary to establish murder in the first degree and then proof that it was committed in the

commission of a felony. "[I]f the killing is done by the accused when engaged in the commission of a felony it constitutes the offense of murder in the first degree, although the killing was casual and unintentional." *Smith v. State,* 209 Tenn. 499, 354 S.W.2d 450, 451 (1961). The trial-Court made no error with respect to the complained-of instruction and, thus, this claim has no merit.

As the petitioner Mr. Hubert Sheffield has failed to establish a federal-constitutional deprivation resulting in his state-court conviction, he hereby is DENIED all relief.[1] Judgment to that effect will be entered by the clerk, Rule 58(1), F.R.Civ.P.

Should the petitioner give timely notice of an appeal from the judgment to be entered herein, he is authorized to proceed thereon *in forma pauperis.* Rule 24(a), F.R.Civ.P. Any such notice will be treated also as an application for a certificate of probable-cause. Rule 22(b), F.R.App.P., which WILL issue because of the multiple legal issues implicated herein. *Id.*

The petitioner's motion for the appointment of counsel hereby is DENIED.[2]

---

1. Mr. Sheffield also raises four issues herein that relate to the conduct of his sentencing-hearing and the imposition of the death-penalty. These issues are now moot, in that the Supreme Court found merit in one of these issues and ordered a new sentencing-hearing. *State v. Sheffield,* 676 S.W.2d 542, 553 (Tenn.1984). Mr. Sheffield presents no constitutional challenge herein to the second sentencing hearing.

2. This Court previously granted Mr. Sheffield's application to proceed *in forma pauperis. See* order herein of October 6, 1987.