**UNITED STATES of America,**

v.

**Joseph Frank LAMANTIA, et al.**

**No. 93–CR–523.**

United States District Court,
N.D. Illinois,
Eastern Division.

June 3, 1994.

---

Louis Carbonaro, Carbonaro & Carbonaro, Chicago, IL, for Joseph Frank Lamantia.

Charles J. Aron; Louis Carbonaro, Carbonaro & Carbonaro; and Martin Steven Agran, Agran & Agran, Ltd., Chicago, IL, for Aldo John Piscitelli.

Sheldon Bart Nagelberg, Chicago, IL, for Joe Wing.

Louis Carbonaro, Carbonaro & Carbonaro and Michael James Falconer, Chicago, IL, for Kenneth C. Hom.

Daniel S. Alexander and Patrick Eamon Boyle, Arnold & Alexander, Ltd., Chicago, IL, for Dominic Scalfaro.

Gary Jay Ravitz, Chicago, IL, for Philip F. Bertucci.

James Philip Hilliard; and Timothy Patrick Donohue, Law Offices of Timothy P. Donohue, Chicago, IL, for Gino Levato.

Joseph A. Pavone, Oakbrook, IL, for Joseph W. Coco.

Robert A. Novelle, Serpico, Novelle, Dvorak & Navigato, Ltd., Chicago, IL, for Joseph Tony Gallo.

John Joseph Scully, U.S. Attorney's Office, Chicago, IL, for the U.S.

### MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

The issues raised in defendants' Joint Motion to Dismiss the Indictment Based on Grand Jury Impropriety present a question of first impression, to wit, can an indictment stand when a grand juror has been convicted of felonies committed as a member of the indicting grand jury? We find that juror Girardi's illegal actions have nullified the indictment, and therefore grant the defendants' Motion to Dismiss.

### Undisputed Facts.

On May 18, 1994, Robert M. Girardi was convicted of contempt of court, bribery and obstruction of justice for selling information pertaining to the Special October 1992—I Grand Jury. Girardi first discussed the grand jury proceedings with his childhood friend Richard Gelsomino, who was under investigation by the grand jury. Gelsomino has stated that, as soon as Girardi learned he was selected to sit on the grand jury, he agreed to provide Gelsomino with details of the proceedings. Girardi also asked Gelsomino to find someone who would be willing to pay for the secret grand jury information.

Gelsomino passed Girardi's information on to Richard Lantini, who was also under investigation by the grand jury. Apparently believing he was being set up, Lantini told his attorney of Gelsomino's disclosures. Lantini's attorney subsequently informed the FBI.

After being questioned by the FBI, Gelsomino implicated Girardi as the source for his inside information. Girardi apparently expressed considerable disrespect for the process, calling the grand jury proceedings a "kangaroo court" where anyone could be indicted. Gelsomino also claimed that Girardi had told him that there were three other jurors who would sell their votes for trips to Hawaii and $10,000 cash.

As part of its investigation of Girardi, the FBI interviewed the grand jurors with whom Girardi appeared to be most closely associated. Not surprisingly, all 11 jurors interviewed denied any knowledge of Girardi's actions. The government also learned that another party investigated by the grand jury allegedly informed Gelsomino that he had a female source within the Department of Justice who kept him informed of the grand jury's progress. Finally, Lantini stated that he received a phone call from a woman who told him he would not be indicted if "he came up with the money."

Girardi admitted telling Gelsomino that three other jurors would sell their votes, but denied actually discussing his activities with any other members of the grand jury. He further denied that there were any other

jurors willing not to indict certain defendants in exchange for tickets to Hawaii and cash. Girardi was not charged with attempting to hold up an indictment for money. Gelsomino, Lantini and the defendants herein were all indicted by the Special Grand Jury.

### The Role of the Grand Jury in Federal Prosecutions.

An indictment by a federal grand jury is neither a mere formality nor an empty exercise to be performed by the government before a person can be held to answer for a criminal offense. The right to an indictment by a legally constituted, impartial grand jury is explicitly guaranteed by the Fifth Amendment to the Constitution. This right must mean more than an indictment by a body consisting of at least one member who viewed the proceedings as a "kangaroo court" and was willing to trade his solemn obligations for cash. We do not share the disrespect some courts and prosecutors have displayed for the grand jury system (observed by the Supreme Court over 20 years ago[1]) and refuse to acquiesce in the gradual emasculation of one of our republic's most cherished traditions.

A legally constituted and unbiased grand jury "[i]s the only accusatorial body of the Federal Government recognized by the Constitution." *U.S. v. Mara*, 410 U.S. 19, 28, 93 S.Ct. 774, 779, 35 L.Ed.2d 99 (1973) (Douglas, J., dissenting). Grand juries are "the essence of the rule of the people," *U.S. v. Smyth*, 104 F.Supp. 283, 286 (N.D.Cal.1952), and serve "the invaluable function in our society of standing between the accuser and the accused ... to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will." *U.S. v. Mechanik*, 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring) (citations omitted). By offering to sell grand jury information and, perhaps, the power to in-

dict, Girardi effectively perverted and actually abnegated the Special October 1992—I Grand Jury's authority as a legally constituted accusatorial body. As such, its indictment of the defendants is irreparably corrupted, and cannot stand.

### Girardi's Actions Amounted to More than a Secrecy Violation.

■ In their briefs, defendants gave a thorough review and analysis of the history of the grand jury and its preeminence as a buffer between the government and the citizenry. In so doing, the defendants addressed some of the due process concerns that this Court initially felt in hearing of Girardi's offensive conduct and that we expressed to the parties in open court. The government elected to down play these due process concerns, and attempted to paint Girardi's actions as a mere breach of his duty to keep the grand jury proceedings confidential. Its argument was belied by the fact that its subsequent indictment of Girardi shows that his actions resulted in violations to the criminal justice system which were much more significant than a breach of the secrecy provisions of Rule 6(e).

For example, one statute under which Girardi was convicted required the jury to find that Girardi's actions were "corrupt." 18 U.S.C. § 1503. The jury convicting Girardi was also obligated to find that Girardi "corruptly" demanded "money in return for being induced to do acts in violation of his official duty." 18 U.S.C. § 201(b)(2)(C). It is both reasonable and appropriate for us to conclude that Girardi's "corrupt" actions infected and tainted the grand jury process itself and that the harm resulting from Girardi's actions is both different from and greater than the harm which results from a simple violation of Rule 6(e). Here, the defect is "so fundamental that it causes the grand jury no longer to be a grand jury, [and] the indictment no longer to be an indictment." *Mid-*

---

1. "It is, indeed, common knowledge that the grand jury, having been conceived as a bulwark between the citizen and the Government, is now a tool of the Executive ... [i]t is not uncommon for witnesses summoned to appear before the grand jury at a designated room to discover that the room is the room of the prosecutor." *U.S. v. Mara*, 410 U.S. 19, 23–24, 93 S.Ct. 774, 777, 35 L.Ed.2d 99 (1973) (Douglas, J. dissenting); "The grand jury may not always serve its historic role as a protective bulwark standing solidly between the ordinary citizen and an overzealous prosecutor ..." *U.S. v. Dionisio*, 410 U.S. 1, 17, 93 S.Ct. 764, 773, 35 L.Ed.2d 67 (1972).

*land Asphalt Corp. v. United States,* 489 U.S. 794, 802, 109 S.Ct. 1494, 1500, 103 L.Ed.2d 879 (1989).

### The Harmless Error Doctrine is Inappropriate.

■ The presence and participation of a grand juror who exhibited and exercised utter disregard for the equitable administration of justice caused a *structural defect* in the grand jury process, and, therefore, a substantial constitutional deprivation to the defendants. Girardi's misdeeds were not simply an error in the *trial process.* A recent Supreme Court case informs us of the distinction between fundamental error and trial errors, and helps us distinguish simple violations of Rule 6 from the obstruction of justice which occurred in this case.

In *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), *reh. den.* 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 472 (1991), the Supreme Court articulated a test for determining whether a violation of a criminal defendant's constitutional rights is so fundamental to our democratic system that prejudice is presumed, or whether the violation merely requires analysis under the "harmless error" doctrine. The *Fulminante* Court was considering whether the admission into evidence of an involuntary confession required an automatic reversal of a conviction, or whether the defendant was required to show prejudice.

In its analysis, the Supreme Court noted that the harmless error doctrine was not appropriate where structural defects in the administration of criminal justice were implicated. These errors of "constitutional magnitude" include the unlawful exclusion of members of a defendant's race from the grand jury, the right to self-representation at trial and the right to a public trial. *Fulminante,* 499 U.S. at 310, 111 S.Ct. at 1265, *citing, Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); *McKaskle v. Wiggins,* 465 U.S. 168, 177–178 n. 8, 104

S.Ct. 944, 950–51 n. 8, 79 L.Ed.2d 122 (1984), *reh. den.* 465 U.S. 1112, 104 S.Ct. 1620, 80 L.Ed.2d 148 (1984); *Waller v. Georgia,* 467 U.S. 39, 49, n. 9, 104 S.Ct. 2210, 2217, n. 9, 81 L.Ed.2d 31 (1984). The *Fulminante* Court found that the harmless error doctrine *is* appropriate in situations where the constitutional violation resulted in the introduction of inappropriate evidence into an otherwise fair trial. 499 U.S. at 310, 111 S.Ct. at 1265.[2]

The *Fulminante* rubric readily distinguishes the instant case from *Bank of Nova Scotia v. U.S.,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). In *Bank of Nova Scotia,* a district court dismissed an indictment on the grounds that the federal prosecutor had violated Rules 6(e) and 6(d) and otherwise acted improperly in putting his case before the grand jury. The Supreme Court found that Federal Rule of Criminal Procedure 52(a) applied to the prosecutorial misconduct at issue, and that the district court did not have the authority to dismiss an indictment, without a showing of prejudice to the defendants. 487 U.S. at 255, 108 S.Ct. at 2373.

The errors treated in *Bank of Nova Scotia* did not arise from the grand jury itself, but concerned matters placed before the grand jury. There is a fundamental difference between the prosecutorial misconduct at issue in *Bank of Nova Scotia* and the misbegotten indictment at issue here. Like the cases cited by the Supreme Court in support of its holding in *Fulminante,* prosecutorial misconduct concerns matters presented to the grand jury, *ie.* matters of evidence. A reviewing court can cull out the prosecutor's improper statements and determine whether the defendant has been prejudiced. A reviewing court cannot, in this case, filter out or erase the taint Girardi's actions have placed on the grand jury's indictments.

This difference is apparent in decisions where courts considered structural defects in the grand jury process, and decided that the

---

**2.** Supreme Court precedent not cited in *Fulminante* which applied the harmless error doctrine to constitutional violations are in accord with our analysis. For example, in *Coleman v. Alabama,* 399 U.S. 1 [90 S.Ct. 1999, 26 L.Ed.2d 387] (1970), the Court applied the harmless error test to the wrongful denial of counsel at a preliminary hearing. The Court's inquiry into whether the defendant was prejudiced was premised on its concern that certain prejudicial *evidence* may be uncovered at a preliminary hearing.

only remedy for these defects was a dismissal of the indictment. These structural defects occur, for example, when either racial or gender bias were exercised in selecting members of the grand jury and where the grand jury term was improperly extended. *Vasquez v. Hillery,* 474 U.S. 254, 263, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986); *Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979); *Ballard v. U.S.,* 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946); *U.S. v. Bolton,* 893 F.2d 894 (7th Cir.1990); *U.S. v. Taylor,* 841 F.2d 1300 (7th Cir.1988), *cert. den. sub nom Rosenstein v. U.S.,* 487 U.S. 1236, 108 S.Ct. 2904, 101 L.Ed.2d 937 (1988); *U.S. v. Armored Transport, Inc.,* 629 F.2d 1313 (9th Cir.1980), *cert. den.* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); *U.S. v. Macklin,* 523 F.2d 193 (2nd Cir.1975); *U.S. v. Fein,* 504 F.2d 1170 (2nd Cir.1974).

The Supreme Court in *Vasquez* held that indictments rendered from an improperly impaneled grand jury must be dismissed. These invalid indictments cannot be cured by a subsequent error-free trial because the grand jury shapes the indictment and therefore substantially influences the way in which the case is put before a petit jury. 474 U.S. at 263, 106 S.Ct. at 623. The *Rose* court found that "alternate remedies" to dismissing an indictment (in that case—civil suits charging discrimination; here—contempt proceedings against Girardi) cannot cure an improper indictment. 443 U.S. at 558, 99 S.Ct. at 3001. Finally, the *Ballard* court likewise found that structural defects could only be cured by a dismissal of the indictment. 329 U.S. at 196, 67 S.Ct. at 265. In other words, if a grand jury is improper, any ensuing indictment is also improper, cannot be cured, and must be dismissed.

Further, although the Supreme Court has apparently not addressed the issue, there is no "cure" for indictments issued by a grand jury after its term has expired because the validity of the grand jury itself is in question. *Bolton; Armored Transport; Macklin; Fein, supra.* The *Macklin* court even upheld the trial court's dismissal of an improperly rendered indictment, although the defendant in that case had pled guilty. "We cannot erode the protective formality of the role [of the grand jury] because of a hard case. The charge to which the appellee pleaded guilty was contained in the very indictment we have held to be a nullity." 523 F.2d at 196.

Similarly, we should not here pierce the veil of secrecy surrounding the grand jury's deliberations to determine the numerical basis for the defendants' indictment. The government argues that, unless the defendants show that fewer than 12 qualified grand jurors voted to indict them, Rule 6(b)(2) prohibits a dismissal. This argument is without merit. First, there is no question of grand juror "qualification," as is meant by the Rule and 28 U.S.C. § 1867. Second, and more importantly, the Rule does not apply because, as in *Vasquez,* the entire grand jury has been tainted. No court can erase the taint.

The only remedy, then, for an improperly constituted grand jury is the one issued here today: a dismissal of the indictment. The Supreme Court in *Vasquez* did not instruct a reviewing court to determine whether a grand jury would have indicted the defendant if he were white, because that question does not address the problem inherent in having a defective grand jury. Likewise, the court in *Macklin* did not accept the defendant's plea because it would have validated a violation of a right guaranteed by the constitution and ridiculed a part of our criminal justice system that stands as the only protection we have against wrongfully brought criminal charges.

We cannot here, then, separate the harm resulting from Girardi's actions from the defendants' indictments, because the harm was inflicted on the judicial process and thereby to the defendants. Indeed, the "harm" caused by Girardi's illegal conduct runs not simply to the defendant, but "to the jury system, to the law as an institution, to the community at large and to the democratic ideal reflected in the process of our courts." *Ballard,* 329 U.S. at 195, 67 S.Ct. at 265.

### The Injury to the System Out Weighs Any Inconvenience to the Government.

Although we do not believe that we are obligated to weigh the costs to the govern-

ment of dismissing this indictment against the harm to the defendants, we note that, in dismissing this indictment, we are not significantly inconveniencing the government. It has at least six months in which to re-indict the defendants without running into any statute of limitations problems. 18 U.S.C. § 3288. Since there has been no trial, the costs to the judicial system are minimal. *Rose,* 443 U.S. at 558, 99 S.Ct. at 3001, *cf., U.S. v. Mechanik,* 475 U.S. 66, 72, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986) (discussing generally costs of reversing conviction after trial).

Also, the U.S. Attorney has shown considerable alacrity in obtaining indictments. Girardi was, for example, arrested on January 5, 1994, indicted on January 20, 1994 and convicted on May 18, 1994. The Court wonders why the U.S. Attorney refused to voluntarily dismiss the indictments in this case and reindict, rather than allow the reputation of the local Grand Jury to suffer this blemish.

Further, after reviewing the FBI reports, we are unconvinced that the defendants were not prejudiced by the Special Grand Jury's improper actions. Although we cannot expound in great detail about the FBI reports submitted in support of the government's Response, we believe a brief summary of some of the events shows that the defendants may have suffered prejudice.[3]

As an initial matter, the jurors who were allegedly willing to sell their votes (including Girardi) could have voted to indict certain defendants in retaliation for not receiving the bribes they purportedly solicited. This possibility coupled with the offer made to Lantini raise a genuine issue of the existence of other jurors who did not exercise impartiality when performing their official duties.

In addition, one grand juror "treated" at least half of the grand jury to drinks and dinner. This generous juror became so intoxicated on one occasion, that his memory of the evening is a blank. It is very likely that the jurors discussed the grand jury proceedings while at these public parties. Also, one party under investigation stated that he received information about the grand jury from a source *other than* Girardi. Thus, Girardi may not have been the only juror involved in serious impropriety or guilty of breaching Rule 6(e).

Further, one of the jurors admitted to the FBI that on at least one occasion he used facial expressions and other non-verbal communication to move Girardi into voting for an indictment. This hints at a possible "pack mentality" pervasive throughout this grand jury that could have severely prejudiced these defendants.

In addition to possibly prejudicing the defendants, sustaining these tainted indictments would wreak considerable harm on the judicial process itself. Girardi's arrest, trial and conviction were widely publicized and certainly caused people to question the integrity of the grand jury system. Girardi's actions "destroyed the appearance of justice and thereby cast doubt on the integrity of the judicial process." *Rose,* 443 U.S. at 555, 99 S.Ct. at 3000. These doubts can not be mollified solely by Girardi's trial and conviction. Indeed, as Justice Frankfurter stated almost 40 years ago:

> The untainted administration of justice is certainly one of the most cherished aspects of our institutions. Its observance is one of our proudest boasts.... Therefore, fastidious regard for the honor of the administration of justice requires the Court to make certain that the doing of justice be made so manifest that only irrational or perverse claims of its disregard can be asserted.

---

3.   We question the propriety of submitting these reports *ex parte in camera,* without leave of court. We also question the government's use of these "secret" reports in support of their pleadings in this case; these reports do not concern the grand jury, *per se,* but were part of the FBI's investigation of Girardi's criminal activity. They were not essential to the government's position in its Response. It strikes us fundamentally unfair that the government

asks us to make a decision of Constitutional import to the defendants, based on documents to which the defendants never had access. "It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. U.S.,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

**430**

*Communist Party of the U.S. v. Subversive Activities Control Bd.,* 351 U.S. 115, 124, 76 S.Ct. 663, 668, 100 L.Ed. 1003 (1956).

We are aware that other judges have held that Girardi's illegal actions do not warrant a dismissal of an indictment. *U.S. v. Li,* 1994 WL 118539 (N.D.Ill., April 6, 1994); *U.S. v. Coffey,* 1994 WL 118513 (N.D.Ill., April 5, 1994). Our review of those opinions shows that Girardi's actions were apparently presented to our sister courts in terms of a Rule 6(e) violation. If Girardi had spoken to his wife or neighbors about the grand jury proceedings or otherwise simply "broken the rules," we would have joined in our fellow judges' decisions. As explained above, however, the defendants herein presented a compelling due process argument. This case had Constitutional import that goes beyond a mere breach of secrecy or violation of a rule of procedure.

### Conclusion.

The situation presented here troubles us deeply and compels us not to be complacent about attempting to preserve the integrity of our democratic institutions in the eyes of the public. Too often actors in the criminal justice system trample over the rights of the accused in pursuit of a conviction at any cost. Too often we overlook or minimize these violations of Constitutionally guaranteed rights because it is easier than upsetting the course of a criminal prosecution. We will not, for the sake of convenience, sustain these indictments simply on the ground that these defendants will probably be re-indicted; we will not so easily dispense with our responsibilities as guardians of the Constitution and administrators of the criminal law. "Justice must maintain the appearance of justice." *Liteky v. U.S.,* —— U.S. ——, ——, 114 S.Ct. 1147, 1162, 127 L.Ed.2d 474 (1994) (Kennedy, J., concurring). In this case, the reality as well as the appearance of justice demand a dismissal of the indictments.