UNITED STATES of America,
Plaintiff–Appellant,

v.

Joseph F. LAMANTIA, Aldo J. Piscitelli,
Joe Wing, Kenneth C. Hom, Dominic
Scalfaro, Philip F. Bertucci, Joseph J.
Cutrano, Gino Levato, Joseph W. Coco,
and Joseph T. Gallo, Defendants–Appel-
lees.

No. 94–2667.

United States Court of Appeals,
Seventh Circuit.

Argued April 7, 1995.

Decided July 13, 1995.

John J. Scully (argued), Crim. Div., Barry Rand Elden, Asst. U.S. Attys., Scott Charles Collins, Chicago, IL, for U.S.

Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers (argued), Seiden & Associates, Louis Carbonaro, Carbonaro & Carbonaro, Chicago, IL, for Joseph F. Lamantia and Gino Levato.

Martin S. Agran, Agran & Agran, Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers, Louis Carbonaro, Charles J. Aron, Chicago, IL, for Aldo J. Piscitelli and Joseph J. Cutrano.

Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers, Sheldon Nagelberg, Chicago, IL, for Joe Wing.

Michael J. Falconer, Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers, Louis Carbonaro, Chicago, IL, for Kenneth C. Hom.

Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers, Daniel S. Alexander (argued), Arnold & Alexander, Chicago, IL, for Dominic Scalfaro.

Gary J. Ravitz, Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers, Chicago, IL, for Philip F. Bertucci.

Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers, Chicago, IL, Joseph A. Pavone, Oak Brook, IL, for Joseph W. Coco.

Robert A. Novelle, Joel A. Whitehouse, Serpico, Novelle & Navigato, Timothy P. Donohue, James P. Hilliard, Lawrence Edmund Sommers, Chicago, IL, for Joseph T. Gallo.

Before CUMMINGS, EASTERBROOK and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

In July 1993, a grand jury indicted these defendants on a number of gambling and racketeering charges. Some time later the defendants learned that a grand juror named Robert Girardi had been caught purveying details of the grand jury's investigation to some of its subjects. In December 1994, while their trial was still pending, defendants challenged their indictment on the basis that Girardi's misconduct violated their due process rights. The district judge agreed: he dismissed the indictment, concluding that Girardi's corrupt actions "infected and tainted the grand jury process itself." *United States v. Lamantia,* 856 F.Supp. 424, 426 (N.D.Ill.1994). The government appeals the district court's ruling, and we reverse.

## BACKGROUND

Robert Girardi began sitting as a member of the Special October 1992–I Grand Jury on January 4, 1993. Viewing his jury service as a potentially lucrative opportunity, Girardi asked a friend named Richard Gelsomino, whom the grand jury was investigating at the time, if Gelsomino knew anyone who might pay for information about the proceedings. Gelsomino met with Girardi on several occasions to glean information about the investigation from him, but did not succeed in interesting anyone else in the offer. He did relay Girardi's offer to another grand jury target named Richard Lantini, but Lantini apparently was concerned that this offer was too good to be true. Lantini consulted his attorney about what he should do, and the attorney contacted the FBI.

FBI agents subsequently investigated the allegations regarding Girardi's misconduct, initially by tape recording conversations between Girardi and Gelsomino (who by that point was cooperating with the government). One FBI agent posed as an individual interested in purchasing information from Girardi, who expressed a willingness and desire to consummate the deal. In these conversations, Girardi told the agent that he was working alone in selling the grand jury information and that apart from his brother, no one else knew of his actions.

In January 1994, agents arrested Girardi after he agreed to a $500–per–week deal with the undercover FBI agent. Girardi was convicted of contempt of court, bribery, and obstruction of justice and is now serving a 98–month sentence.

In order to determine the extent of the corruption within the Special October 1992–I Grand Jury, FBI agents subsequently interviewed 11 grand jurors who were known to socialize with Girardi. All eleven denied knowing what Girardi had been up to or participating in it in any way. Interviews with Gelsomino and Lantini, however, suggested the possibility of more pervasive grand juror misconduct. Gelsomino told interviewers that he had a female source of information regarding the proceedings, although he did not identify her as a grand juror. Lantini, through his attorney, asserted that a woman had contacted him anonymously and told him he would not be indicted if he "came up with the money." The FBI found no corroborating evidence to support these isolated allegations of more widespread

impropriety; Girardi's criminal activities alone were confirmed.

Discovery of Girardi's misconduct created a stampede to the courthouse as people who had been indicted by the grand jury (and in some cases, convicted) challenged their indictments. These challenges were for the most part unsuccessful. See, *e.g., United States v. Coffey*, 854 F.Supp. 520, 522–524 (N.D.Ill.1994) (Plunkett, J.); *United States v. Li*, 856 F.Supp. 411, 415–416 (N.D.Ill.1994) (Hart, J.); *United States v. Mebust*, 857 F.Supp. 609, 617–618 (N.D.Ill.1994) (Williams, J.); *United States v. Messino*, 855 F.Supp. 955, 959–960 (N.D.Ill.1994) (Alesia, J.).

The lone exception occurred in this case: the district judge, castigating what he called "the disrespect some courts and prosecutors have displayed for the grand jury system ... and ... the gradual emasculation of one of our republic's most cherished traditions," dismissed the indictment against these defendants under his supervisory powers, ruling that grand juror misconduct had created a structural defect in the indictment process. *Lamantia*, 856 F.Supp. at 426.

## ANALYSIS

■ Robert Girardi betrayed his service as a grand juror. That much is undisputed and, given Girardi's subsequent prosecution and incarceration, merits no further consideration. The relevant question for purposes of this case is not whether Girardi undermined his role as a grand juror, but whether he (alone or with others) undermined the role of the grand jury—whether the circumstances "significantly infringed on the ability of the grand jury to exercise independent judgment." *United States v. Edmonson*, 962 F.2d 1535, 1539 (10th Cir.1992); see also *United States v. Cederquist*, 641 F.2d 1347, 1353 (9th Cir.1981). Only if the latter is true did the district court have authority to dismiss the indictment—for as a rule courts are not endowed with supervisory authority over the grand jury, which was conceived and remains functionally independent. See *United States v. Williams*, 504 U.S. 36, 47–48, 112 S.Ct. 1735, 1742, 118 L.Ed.2d 352 (1992) (discussing history of grand jury as "kind of

buffer or referee" belonging to no branch of institutional government, and concluding that judicial supervision is "very limited"); see also *United States v. Gillespie*, 974 F.2d 796, 800–801 (7th Cir.1992); *United States v. Schwartz*, 787 F.2d 257, 267 (7th Cir.1986) (both acknowledging courts' limited supervisory powers). Courts are generally not free to delve beneath the four corners of a validly returned indictment; they are generally not free to prescribe rules for the operation of the grand jury beyond those set out by Congress. *Costello v. United States*, 350 U.S. 359, 364, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956) (review of facially valid indictments "would run counter to the whole history of the grand jury institution"); *Williams*, 504 U.S. at 50, 112 S.Ct. at 1744 ("any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings.").

■ These restrictions do not, of course, render the judicial system completely impotent in the face of grand jury improprieties. Where the misconduct amounts to one of those "few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions," *United States v. Mechanik*, 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring), then the court's supervisory authority can be used to dismiss an indictment. It is not enough, however, that the rules have been violated or that "the integrity of the judicial process" has been impugned; the defendant must have suffered prejudice as a result. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254, 108 S.Ct. 2369, 2373, 101 L.Ed.2d 228 (1988) ("as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.").

Girardi's unauthorized disclosures and attempts to secure payments in exchange for information certainly violated clear rules promulgated for the grand jury. Rule 6 of the Federal Rules of Criminal Procedure, which governs grand jury formation and conduct, prohibits grand jurors from disclosing "mat-

ters occurring before the grand jury," and prescribes that a "knowing violation of [this Rule] may be punished as a contempt of court." Fed.R.Crim.P. 6(e). Therefore the district court had the supervisory authority, under *Bank of Nova Scotia*, to dismiss defendants' indictment if the court found that they had suffered prejudice.

■ The district court did not make factual findings of prejudice, although it did analyze the available evidence in some detail. Instead, the court concluded that because of the nature of the improprieties, a showing of prejudice was not a necessary prerequisite to relief for the defendants. Proclaiming that Girardi's misconduct had "irreparably corrupted" the indictment process, the district court held that in this case the structural protections of the grand jury had been compromised beyond repair. 856 F.Supp. at 428.

This conclusion is not devoid of support in the case law. The Supreme Court has on a number of occasions held that deep-rooted irregularities in grand jury composition could affect the deliberative process and create a structurally defective body such that indictments could be dismissed without a showing of prejudice. See, *e.g., Vasquez v. Hillery*, 474 U.S. 254, 260–264, 106 S.Ct. 617, 621–624, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jurors compelled dismissal of indictment); *Rose v. Mitchell*, 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (same); *Ballard v. United States*, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946) (exclusion of women from grand jury compels dismissal).

However, as clarified in *Bank of Nova Scotia*, 487 U.S. at 256–257, 108 S.Ct. at 2374–2375, these "structural defect" cases are not isolated exceptions to an overall rule, but rather part of a discrete line of cases with a coherent message.[1] Rather than require defendants to make the all-but-impossible showing of how subtle, inherent biases and stereotypes from a racially or gender discriminatory jury can affect the indictment process to their detriment, the Supreme Court simply created an irrebuttable presumption of prejudice in these cases. *Id.* at 257, 108 S.Ct. at 2375 ("the nature of the violation allow[s] a presumption that the defendant was prejudiced, and any inquiry into harmless error would have required unguided speculation").[2]

The situation faced by the defendants in the present case cannot be shoehorned into the *Vasquez* line simply by calling the problem a structural one or alleging that misconduct makes the "grand jury no longer a grand jury." *Lamantia*, 856 F.Supp. at 426, quoting *Midland Asphalt Corp. v. United States*, 489 U.S. 794, 802, 109 S.Ct. 1494, 1499–1500, 103 L.Ed.2d 879 (1989). The Special October 1992–I Grand Jury apparently was properly constituted (there is no allegation that it was not). Both women and minorities were called to service. The requisite number of grand jurors were in attendance. In short, there was nothing about its inherent structure that would mandate or

---

1. The district judge in the instant case linked the *Vasquez* line of cases with a series of cases invalidating indictments issued by a grand jury whose term had expired. See, *e.g., United States v. Bolton*, 893 F.2d 894 (7th Cir.1990); *United States v. Taylor*, 841 F.2d 1300 (7th Cir.1988), certiorari denied *sub nom. Rosenstein v. United States*, 487 U.S. 1236, 108 S.Ct. 2904, 2905, 101 L.Ed.2d 937 (1988). These cases, which turn on adherence to the rules prescribed by the Federal Rules of Criminal Procedure, do not involve the presumption of prejudice.

2. The Supreme Court has explicitly limited the reach of cases such as *Vasquez*. In *Mechanik*, the Court noted that *Vasquez* was "compelled by precedent directly applicable to the special problem of racial discrimination" because "one could presume that a discriminatorily selected grand jury would treat defendants of excluded races

unfairly." 475 U.S. 66, 71 n. 1, 106 S.Ct. 938, 942 n. 1, 89 L.Ed.2d 50 (1986). Thus, "the remedy of automatic reversal was necessary as a prophylactic means of deterring grand jury discrimination in the future."

The Court continued:
We think that these considerations have little force outside the context of racial discrimination in the composition of the grand jury. No long line of precedent requires the setting aside of a conviction based on a rule violation in the antecedent grand jury proceedings, and the societal interest in deterring this sort of error does not rise to the level of the interest in deterring racial discrimination.
*Id.* While gender discrimination may be viewed as analogous to racial discrimination, corruption among grand jurors may not.

even permit a presumption of prejudice. Unlike a discriminatorily selected grand jury, which "it could be presumed [simply by its composition] would treat defendants unfairly," *Bank of Nova Scotia,* 487 U.S. at 257, 108 S.Ct. at 2375, there was no reason to suspect that this body of grand jurors would not perform its tasks satisfactorily.

Corruption in this grand jury thus was present not from the start as a direct, albeit amorphous, result of its formation, but only after an individual grand juror made the decision to engage in criminal activity. When he did so, he left a trail: he removed notes from the courtroom; made telephone calls that eventually were recorded; contacted potential buyers, who came to include an FBI agent. In short, he gave the government the evidence they needed to later convict him of a number of charges carrying a stiff prison sentence. It seems slightly incongruous, given that defendants' current challenge to their indictment only came to light as a result of disclosures about Girardi's behavior, to conclude that "[a] reviewing court cannot . . . filter out or erase the taint" to determine whether defendants were prejudiced. *Lamantia,* 856 F.Supp. at 427. Far from being a case where prejudice must be presumed, here the evidence of prejudice—or lack thereof—is available for evaluation.

The district judge, as we have stated, did explore the evidence relating to Girardi's misconduct and the subsequent FBI investigation in some detail. Although he suggested (without making explicit findings of fact) that the possibility of prejudice to the defendants loomed large, this conclusion is not credible. Eliminating speculation and unsupported inferences and concentrating specifically on what the investigation unearthed, we conclude that defendants in this case were not prejudiced by Girardi's—or anyone else's—misbehavior.

■ We begin with Girardi. The activities for which he was prosecuted and convicted could not have prejudiced these defendants, or any of the other individuals who were indicted by the grand jury. What he did (according to him, on a solo basis) was to report back to Gelsomino regarding the grand jury: who appeared, the substance of

their testimony, the grand jurors' reactions. Gelsomino took notes on what Girardi told him, and some of defendants' names appeared at least once in these notes. The problem (from defendants' perspective) is that premature access to information about the case building against them, whether in their hands or in someone else's, could only redound to their benefit. Secrecy violations by other grand jurors—none were proven, although the district court thought that some grand jurors might have spilled confidential information in social settings or in drunken stupors—could have had no more damaging effect.

■ The district judge also was concerned that non-verbal communication among jurors prior to voting on indictments indicated a prejudicial "pack mentality." It would be unrealistic, however, to deny that closeting together a group of individuals for up to 18 months would likely create alliances and blocs. These are a natural part of group behavioral dynamics, like it or not; as a matter of law a conclusion of prejudice based on one juror's raising his eyebrows at another, which is the sum total of "pack"-like conduct alleged by any juror, simply cannot stand.

■ Defendants raise another more serious argument regarding possible prejudice: that certain of the grand jurors may have solicited bribes in exchange for a refusal to indict. There is evidence uncovered by the FBI, in the form of unsworn testimony from Gelsomino, that Girardi told him about two or three other grand jurors who would sell their votes for cash and tickets to Hawaii. Lantini, through his lawyer, also reported receiving a phone call from an unidentified woman who told him he would not be indicted if he "came up with the money."

The availability of jurors willing to sell their votes, like the possibility of obtaining early disclosures, appears to offer a benefit to interested (and unscrupulous) defendants and to have no effect on anyone else. Defendants, however, complain that in order to maintain a sufficiently high rate of indictments to placate prosecutors and keep suspicions at bay, grand jurors may have evened

the scales to the detriment of those not participating in the bribe scheme. The district court also thought that the bribers may actually have retaliated against non-bribees by indicting them.

These are troubling speculations but they are simply speculations, and they require too many leaps of faith to be credible given the existing evidence. Although Gelsomino told investigators that Girardi said he had two or three other grand jurors ready to sell their votes for cash and trips to Hawaii, there is no other corroboration of Gelsomino's statement. There are, instead, a host of vehement denials from all of the grand jurors who were close to Girardi; Girardi himself told the undercover agent that he was working alone.

Even assuming the existence of a bloc of jurors for sale, there is no evidence that any of them ever solicited a bribe. Lantini did not report any follow-up calls from the anonymous woman, and Girardi never provided additional information about his fellow Hawaii hopefuls. If defendants in this case have more hard evidence—if, for example, they were approached for bribes—they certainly have not apprised us of this fact.

A sound basis to suspect the actual existence of bribe-seekers thus is the first missing link; the second is a reason to suspect retaliation or juggling of indictment statistics by these purported bribees even assuming they exist. Without a reasonable factual foundation for suspicion, there is inadequate evidence to support a finding of potential prejudice to these defendants for the reasons they have stated. And without such a showing, as by now should be clear, the fact that Girardi's criminality cast a pall over the Special October 1992–I Grand Jury does not invalidate its work.

## CONCLUSION

Although this Court shares in the district court's distress over the behavior of Robert Girardi and the corresponding shame and disrepute his actions brought upon the grand jury system, we cannot agree with the district judge's resolution of the instant case. The district court's ruling dismissing the indictment of defendants LaMantia *et al.* thus is vacated, and this case is remanded for proceedings not inconsistent with this opinion. On remand, pursuant to Circuit Rule 36, a different district judge shall hear the case.